**SPX CORPORATION, a Delaware corporation, Defendant Below, Appellant,**

v.

**GARDA USA, INC., a Delaware corporation and Garda World Security Corporation, a corporation organized under the laws of Canada, Plaintiffs Below, Appellees.**

No. 332, 2013.

Supreme Court of Delaware.

Submitted: April 23, 2014.
Decided: June 16, 2014.
Reargument Denied June 24, 2014.

John V. Fiorella, Esquire (argued), Archer & Greiner, P.C., Wilmington, Delaware, for Appellant.

Peter B. Ladig, Esquire, Brett M. McCartney, Esquire, Morris James LLP, Wilmington, Delaware, for Appellees.

Of Counsel: Jeffrey A. Simes, Esquire (argued), Goodwin Proctor LLP, New York, New York.

Before STRINE, Chief Justice, HOLLAND, BERGER, JACOBS and RIDGELY, Justices, constituting the Court en Banc.

BERGER, Justice:

■ In this appeal we consider the circumstances under which an arbitration award may be vacated where it is argued that the arbitrator manifestly disregarded the law. The parties to a corporate acquisition agreed to arbitrate disputes about the acquired company's balance sheet on the effective date of the transaction. They retained an arbitrator to decide whether a workers' compensation reserve had been calculated correctly. The arbitrator decided, without any analysis, that there would be no adjustment to the balance sheet. The Court of Chancery vacated the arbitrator's decision, finding that the arbitrator did not follow the relevant provision of the parties' share purchase agreement. But the test for "manifest disregard for the law" is not whether the arbitrator misconstrued the contract-even if the contract language is clear and unambiguous. To vacate an arbitration award based on "manifest disregard of the law," a court must find that the arbitrator consciously chose to ignore a legal principle, or contract term, that is so clear that it is not subject to reasonable debate. As the record does not support such a finding, the arbitrator's award must be reinstated.

## FACTUAL AND PROCEDURAL BACKGROUND

In November 2005, SPX Corporation entered into an agreement to sell all of the capital stock of its subsidiary, Vance International, to Garda USA, Inc., and its parent company, Garda World Security Corporation (collectively, "Garda"). On January 13, 2006, the parties entered into an Amended and Restated Stock Purchase Agreement (the "SPA"), under which Garda agreed to purchase Vance's stock for $67,250,000 plus Net Cash. The actual purchase price was subject to adjustment based on differences between SPX's Pre–Closing Balance Sheet, produced five days before closing, and the Effective Date Balance Sheet, produced within 60 days after closing.

On both balance sheets, Working Capital was to be calculated in accordance with the Working Capital Schedule contained in Section 1.3 of the SPA's Seller Disclosure Schedule. The Working Capital Schedule defines Vance's Working Capital generally as "current assets minus current liabilities, calculated in accordance with U.S.

GAAP...." [1] But there are specified exceptions. Section 1.3(a)(v) addresses the treatment of "incurred but not reported claims" ("IBNR") relating to workers' compensation liabilities:

a) The calculation of current assets and current liabilities shall exclude the following accounts and balances:

* * *

v. Incurred but not reported and reported claims related to risk management programs, with the exception of those claims related to workers' compensation liabilities, which shall be included in the calculation of current liabilities; [2]

Section 1.3(c) of the Working Capital Schedule also requires that reserves be calculated in a manner consistent with methods used on interim financial statements prepared for Vance before the parties entered into the SPA:

c) In preparing the Closing Date Statement of Working Capital, the respective amounts included ... for all reserves ... that were valued for the interim September 30, 2005 financial statements , .... shall be calculated using the same methodology in respect of such items on the interim September 30, 2005 financial statements but the application of the methodology shall reflect changes in circumstances or events occurring and based on the most current information known to SPX, between the date of the interim September 30, 2005 financial statements and the Closing Date.[3]

Throughout the sale process, SPX calculated workers' compensation reserves for Vance as part of the Working Capital computation. SPX listed a workers' compensation reserve of $1.4 million in Vance's interim September 30, 2005 financial statements. SPX again listed a workers' compensation reserve of $1.4 million in Vance's Pre–Closing Balance Sheet. After closing, SPX prepared an Effective Date Balance Sheet in which the workers' compensation reserve was adjusted downward slightly to $1.366 million.[4] IBNR was not included in any of those calculations.

In May 2006, Garda challenged SPX's calculation of the workers' compensation reserve as listed on the Effective Date Balance Sheet. Because the parties were unable to resolve their dispute, they entered into arbitration. Ernst & Young, LLP ("E & Y"), the firm selected to act as arbitrator, prepared a Statement of Work, which was agreed to by the parties. It provided that, "[a]s required by Section 1.3(d)(ii) of the SPA, the Independent Accountant shall base the Award solely upon the presentations of the Parties, and not based upon an independent review or any other source of information." [5] E & Y agreed to issue its Award "in writing, in summary form, setting forth the determination(s) as to the disputed items." [6] But E & Y was not to "make any legal determinations or otherwise rule upon issues of law in rendering the Award." [7]

The parties filed simultaneous opening briefs with E & Y in July 2011. Garda argued that the $1.366 million workers' compensation reserve SPX listed on the Effective Date Balance Sheet was under-

1. Appellant's Appendix at A–0556.

2. *Ibid.*

3. *Ibid.*

4. According to SPX, the adjustment from $1.4 million to $1.366 million accounted for "$34,-000 in claim payments made between October 2005 and March 2006." Appellant's Second Corrected Op. Br. at 10 n. 3.

5. Appellant's Appendix at A–0337.

6. *Id.* at A–0338.

7. *Ibid.*

stated. In support of its contention, Garda noted that: (1) less than a week after closing, SPX's own actuary, AON Risk Consultants, Inc., estimated that the workers' compensation reserve should have been approximately $3 million; (2) Oliver Wyman Actuarial Consulting, Inc., an outside consultant, concluded that the workers' compensation reserve should have been between $3.5 million and $3.9 million; and (3) SPX's controller had signed a representation letter to Vance's post-closing auditor, PriceWaterhouseCoopers, estimating the reserve to be $3 million.

SPX argued that no adjustment to the $1.366 million reserve was necessary because SPX had properly estimated Vance's workers' compensation liability by using "the actual reserve amounts maintained by Vance's workers' compensation carriers to compute the reserve for the ... Working Capital Schedule." [8] SPX also maintained that the reserve listed on the Effective Date Balance Sheet was calculated in accordance with Section 1.3(c) of the SPA. Finally, SPX noted that all relevant workers' compensation claims had been paid to date and were now closed, and that a surplus of approximately $133,000 remained in Vance's workers' compensation liability reserve.

After the opening briefs were submitted, E & Y asked the parties to address specific questions in their reply briefs. E & Y asked SPX to explain why "a workers' compensation reserve liability of $1.366 million is appropriate" despite AON's much higher estimate and SPX's "apparent acknowledgment that third-party actuary valuations were considered by management in determining the reserve." [9] E & Y asked Garda to explain why actuarial estimates should be used to calculate the reserve when real data was available to determine the workers' compensation liabilities Vance actually incurred through May 2011 for all relevant claims.[10]

Garda and SPX filed simultaneous reply briefs in August 2011. SPX argued in its reply brief that the AON analysis was irrelevant because it was designed to help assess SPX's "aggregated corporate reserves" and was not intended to "review loss histories or estimate future claim payments at the level of individual business units." [11] Because the AON analysis did not use "Vance-specific loss factors," it could not produce an appropriate estimate of Vance's workers' compensation reserve liabilities.[12] SPX also maintained that it had consistently applied the method of using insurance carriers' case reserve data to calculate workers' compensation liabilities on the Pre–Closing Balance Sheet, the Effective Date Balance Sheet, and all earlier balance sheets.

Garda argued, for the first time in its reply brief, that SPX violated Section 1.3(a)(v) of the SPA's Seller Disclosure Schedule by failing to include IBNR related to workers' compensation liabilities when calculating Vance's Working Capital. Garda explained that the claims payment data suggesting that the $1.366 million reserve had been sufficient thus far was unhelpful due to the possibility of future recurrence or expansion of injuries that would result in new payments to workers whose claims had previously been "closed." These potential future liabilities, Garda argued, are the reason that Section 1.3(a)(v) requires the inclusion of IBNR in the calculation of Working Capital.

**8.** *Id.* at A–0932–33.

**9.** *Id.* at A–0353.

**10.** *Ibid.*

**11.** *Id.* at A–1046.

**12.** *Id.* at A–1047.

E & Y addressed a final round of questions to both parties, and, after receiving their responses, E & Y issued a determination letter in October 2011. The arbitrator concluded that "no adjustment to Closing Date Working Capital is warranted for workers' compensation liabilities as [Garda] has not demonstrated that [SPX] failed to comply with Section 1.3 of the Seller Disclosure Schedule." [13] E & Y gave no other explanation for its decision.

Garda then filed a complaint in the Court of Chancery asking that the arbitrator's decision be vacated. A Master in Chancery considered the parties' cross-motions for summary judgment, and issued a final Master's Report upholding the arbitrator's decision. Garda filed exceptions, and, after briefing and argument, the Court of Chancery vacated the arbitrator's decision on the ground that the arbitrator manifestly disregarded the terms of the SPA. This appeal followed.

## DISCUSSION

 Although this Court reviews a trial court's decision on cross-motions for summary judgment *de novo*,[14] "review of an arbitration award is one of the narrowest standards of judicial review in all of American jurisprudence." [15] Under § 5714(a)(3) of the Delaware Arbitration Act, an arbitration award will be vacated when "[t]he arbitrators exceeded their powers, or so imperfectly executed them that a final and definite award upon the subject matter submitted was not made." [16] Section 5714 tracks an analogous provision in the Federal Arbitration Act (FAA),[17] and Delaware courts have found that "federal cases interpreting this section are most helpful." [18]

 Under the FAA, vacatur is authorized where the arbitrator acts in "manifest disregard" of the law.[19] The manifest disregard standard requires a party seeking vacatur to prove that the arbitrator was "fully aware of the existence of a clearly defined governing legal principle but refused to apply it, in effect, ignoring it." [20] To meet this standard, the evidence must establish "that the arbitrator (1) knew of the relevant legal principle, (2) appreciated that this principle controlled the outcome of the disputed issue, and (3) nonetheless willfully flouted the governing law by refusing to apply it." [21]

 An arbitrator's awareness of the contract language, however, does not

13. *Id.* at A–0351.

14. *Reserves Mgmt. Corp. v. R.T. Props., LLC,* 80 A.3d 952, 955 (Del.2013).

15. *TD Ameritrade, Inc. v. McLaughlin, Piven, Vogel Sec., Inc.,* 953 A.2d 726, 732 (Del.Ch. 2008) (quoting *Way Bakery v. Truck Drivers, Local No. 164,* 363 F.3d 590, 593 (6th Cir. 2004)).

16. 10 *Del. C.* § 5714(a)(3).

17. *See* 9 U.S.C.A. § 10(a)(4).

18. *Travelers Ins. Co. v. Nationwide Mut. Ins. Co.,* 886 A.2d 46, 49 (Del.Ch.2005) (citation omitted).

19. *Wilko v. Swan,* 346 U.S. 427, 436, 74 S.Ct. 182, 98 L.Ed. 168 (1953), *overruled on other* grounds *by Rodriguez de Quijas v. Shearson/American Exp., Inc.,* 490 U.S. 477, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989).

20. *Duferco Int'l Steel Trading v. T. Klaveness Shipping A/S,* 333 F.3d 383, 389 (2d Cir. 2003); *see also Dawahare v. Spencer,* 210 F.3d 666, 669 (6th Cir.2000) ("[T]o find manifest disregard a court must find two things: the relevant law must be clearly defined and the arbitrator must have consciously chosen not to apply it."); *TD Ameritrade,* 953 A.2d at 733.

21. *Paul Green School of Rock Music Franchising, LLC. v. Smith,* 389 Fed.Appx. 172, 177 (3d Cir.2010) (citation omitted).

prove that the arbitrator "knew of the relevant legal principle" or "appreciated that this principle controlled the outcome of the dispute." Knowledge of the operative legal principle and its proper application can be inferred only "if the court finds 'an error that is so obvious that it would be instantly perceived as such by the average person qualified to serve as an arbitrator.' " [22] "[A]s long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced that he committed serious error does not suffice to overturn his decision." [23]

■ The Court of Chancery decided that: 1) Section 1.3 clearly and unambiguously requires inclusion of IBNR in the reserves; 2) the arbitrator knew what Section 1.3 required, because the arbitrator was given the contract; and 3) the arbitrator refused to apply it "for whatever reason." [24] From these findings, the Court of Chancery concluded that the arbitrator manifestly disregarded the law. The Court of Chancery incorrectly applied the "manifest disregard" standard by failing to consider whether the arbitrator's decision "rationally can be derived from either the agreement of the parties or the parties' submissions to the arbitrator...." [25]

The parties' submissions to the arbitrator establish that they presented two col-orable interpretations of the relevant SPA provision. Under Garda's interpretation, failure to include IBNR would violate Section 1.3(a)(v). Under SPX's interpretation, inclusion of IBNR would violate Section 1.3(c). E & Y asked the parties pointed questions indicating that it considered whether the contract required IBNR to be included in the Working Capital calculation.[26] A reasonable inference to draw from E & Y's award is that the arbitrator adopted SPX's interpretation of Section 1.3. That interpretation may have been wrong, but it was not without a basis in the contract and the parties' submissions. Therefore, under the "manifest disregard" standard, the arbitrator's award is not subject to vacatur.

## CONCLUSION

Based on the foregoing, the judgment of the Court of Chancery is reversed, and the case is remanded for further proceedings consistent with this opinion. Jurisdiction is not retained.

**22.** *Travelers Ins. Co.*, 886 A.2d at 49 (quoting *Duferco*, 333 F.3d at 390).

**23.** *United Paperworkers Int'l Union, AFL–CIO v. Misco, Inc.*, 484 U.S. 29, 38, 108 S.Ct. 364, 98 L.Ed.2d 286 (1987); *see also United Steelworkers of America v. Enter. Wheel & Car Corp.*, 363 U.S. 593, 599, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960) ("[S]o far as the arbitrator's decision concerns construction of the contract, the courts have no business overruling him because their interpretation of the contract is different from his.").

**24.** Appellant's Appendix at A–0034.

**25.** *TD Ameritrade*, 953 A.2d at 732.

**26.** Appellant's Appendix at A–0353, A–0355.