RENDERED:  JUNE 18, 2021; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2019-CA-1753-MR


MULTIBAND CORP., THROUGH ITS
SUCCESSOR IN INTEREST
GOODMAN NETWORKS, INC.                                        APPELLANT


|  | APPEAL FROM MASON CIRCUIT COURT |
| --- | --- |
| v. | HONORABLE JAY B. DELANEY, SPECIAL JUDGE |
|  | ACTION NO. 15-CI-00029 |


J. BASIL MATTINGLY                                              APPELLEE


OPINION
AFFIRMING

** ** ** ** **

BEFORE:  ACREE, DIXON, AND K. THOMPSON, JUDGES.

THOMPSON, K., JUDGE:  Multiband Corp., through its successor in interest

Goodman Networks, Inc., appeals from the Mason Circuit Court's decision to

confirm an arbitrator's decision in favor of J. Basil Mattingly.  We affirm.

        The factual and procedural history of this case is lengthy and tangled.

In the interests of judicial economy, we shall relate only the information necessary

to resolve the issues before us. Though we have considered the parties' voluminous briefs and host of arguments, we likewise will discuss only what we conclude are the most pertinent authorities and arguments, as we deem the plethora of other arguments and citations unnecessary, redundant, or unmeritorious.

In the early 2000s, Mattingly formed/acquired/managed companies involved with satellite television service; those entities formed employee stock ownership plans (the Plans). Mattingly's companies became subsidiaries of DirecTECH Holding Company, Inc. (DT), of which Mattingly was a shareholder and officer, in 2005. The Plans of Mattingly's former companies were merged into DT's Plan, and Mattingly served as a trustee for those Plans until 2007.

In 2007 and 2008, Multiband negotiated to purchase DT's subsidiaries, an acquisition which required Mattingly's approval. To facilitate Multiband's acquisition, Mattingly and Multiband executed two similar indemnity agreements in December 2008. One indemnification agreement pertained to Mattingly in his role as a former Plan trustee and another to his role as a board member. Meanwhile, at some point the United States Department of Labor began investigating DT and its subsidiaries' Plans.

One agreement provides in relevant part that Multiband would "discharge, indemnify and hold [Mattingly] . . . harmless from and against . . . [a]ny and all . . . losses" incurred by Mattingly "in connection with any claims,

actions, proceedings, or suits of any kind or nature whatsoever . . . arising from or in any way related to actions taken, or omitted to be taken" by Mattingly "in connection with" his former role as a Plan trustee.  The other agreement contained similar language regarding Mattingly's service as a board member.

Both agreements contained a clause stating that their "validity, construction and operation . . . shall be governed by the laws of the State of Delaware to the extent not preempted by federal law."  Each agreement also had a mandatory arbitration clause, specifying in relevant part that:

> any and all disputes arising pursuant to any of the terms of this Agreement or which relate in any manner whatsoever to this Agreement which cannot be resolved in a reasonable time by discussions between the Parties shall be submitted to arbitration in Maysville, Kentucky, before a sole arbitrator (the "Arbitrator") selected from Judicial Arbitration and Mediation Services, Inc., Maysville, Kentucky, or its successor ("JAMS"), or if JAMS is no longer able to supply the arbitrator, such arbitrator shall be selected from the American Arbitration Association, and shall be conducted in accordance with the provisions of the [sic] Section 5701 et seq. of the Delaware Uniform Arbitration Act as the exclusive forum for the resolution of such dispute . . . .  Final resolution of any dispute through arbitration may include any remedy or relief which the Arbitrator deems just and equitable, including any and all remedies provided by applicable state or federal statutes[.]

Multiband's purchase of DT was completed in 2009.

In December 2009, the Department of Labor sued Mattingly and others in federal court in Kentucky regarding alleged improprieties involving the

Plans. Multiband denied Mattingly's claims for advanced attorney fees and indemnification during the course of that litigation. Mattingly and the federal government reached a settlement on June 7, 2011, which required Mattingly to pay over $2,000,000. However, the settlement stated that Mattingly did not admit to any wrongdoing.

Mattingly filed this action against Multiband in the Mason Circuit Court in February 2015 "to compel arbitration of Plaintiff's claims to enforce indemnification obligations owed to Plaintiff by [Multiband]." Eventually, pursuant to the parties' agreement, the court appointed a former federal judge, C. Cleveland Gambill, as arbitrator in January 2017.

During arbitration, Multiband produced a purported settlement agreement between it and Mattingly dated June 30, 2011. In the purported settlement agreement, Mattingly released his indemnification claims in connection with the Department of Labor litigation in exchange for $1,000.

Mattingly challenged this purported settlement agreement, stating that the three-page document was cobbled together with the first and second page not matching the third page in formatting. While Mattingly acknowledged that the signature on the third page was his, he denied ever releasing his indemnification claims. He recalled only signing a single page document at that time which he was told was necessary for a quarterly report.

After conducting an evidentiary hearing, the arbitrator issued his lengthy decision in December 2018. Many issues discussed by the arbitrator are not germane to this appeal, but in pertinent part he found that Mattingly's claims were not time-barred. After deeming it a "most difficult issue[,]" the arbitrator also concluded that "there has been no showing of a mutual intent by the parties to enter into an agreement for a valid, bona-fide release." Ultimately, the arbitrator awarded Mattingly $1,104,910.12 plus $604,420.82 in attorney fees, costs, and interest.

Mattingly then filed a motion in circuit court to confirm the arbitration award; Multiband asked the court to vacate it. Extensive briefing ensued. In October 2019, the circuit court granted Mattingly's motion to confirm the arbitration award. Multiband then filed this appeal.[1]

Multiband first argues Mattingly's claims are time-barred. Second, Multiband argues the arbitrator acted in manifest disregard of the law, principally by not finding that Mattingly had released his claims. Before we may address

---

[1] Multiband initially appealed after the circuit court granted the motion to confirm the award. On the same date Multiband filed its first notice of appeal, the circuit court issued a judgment awarding Mattingly $1,709,330.94 (the total of the arbitrator's award). That judgment was entered by the circuit court clerk two days after it was signed, which means it was also entered two days after Multiband's first notice of appeal. Multiband later filed an amended notice of appeal, stating it was appealing from the order confirming the arbitrator's award and the judgment. Under those facts, we perceive no fatal procedural irregularities, nor does Mattingly so argue.

-5-

those substantive arguments, we must determine the procedural issues of which law applies and our standard of review.

Choice of law provisions in arbitration agreements are "generally valid" in Kentucky. *Hathaway v. Eckerle*, 336 S.W.3d 83, 87 (Ky. 2011). But a choice of law provision is "not a forum-selection clause. Hence, a lawsuit may be brought in one state pursuant to a forum-selection clause, but apply the laws of another state pursuant to a choice-of-law provision." *Padgett v. Steinbrecher*, 355 S.W.3d 457, 462 (Ky.App. 2011) (citation omitted). Thus, the forum for these actions is Kentucky but Delaware law applies.

We reject Mattingly's argument that JAMS rules are controlling, rather than Delaware law. Mattingly's argument is based upon the arbitrator having issued an agreed scheduling order which states in relevant part that "[t]he rules of JAMS shall apply to this arbitration." JAMS Rule 25 provides that "[p]roceedings to enforce, confirm, modify or vacate an Award will be controlled by and conducted in conformity with the Federal Arbitration Act, 9 U.S.C.[2] Sec 1, *et seq*., or applicable state law." Comprehensive Arbitration Rules & Procedures: JAMS Arbitrators & Arbitration Services, https://www.jamsadr.com/rules-comprehensive-arbitration/ (last visited Jun. 11, 2021).

---

[2] United States Code.

JAMS Rule 24(c) provides in relevant part that "[i]n determining the merits of the dispute, the Arbitrator shall be guided by the rules of law agreed upon by the Parties." Comprehensive Arbitration Rules & Procedures: JAMS Arbitrators & Arbitration Services, https://www.jamsadr.com/rules-comprehensive-arbitration/. The parties expressly agreed to have the indemnification agreements governed by Delaware law. Therefore, Delaware law is the controlling "applicable state law" which the arbitrator must honor.

The determination that Delaware substantive law applies does not resolve the procedural arguments, chief among which is Multiband's argument that Mattingly's claims were time-barred. Under Multiband's theory, Delaware's three-year statute of limitations in Delaware Code Annotated, Title 10, section 8106(a) for actions based upon a promise applies and dooms Mattingly's claims since he admitted at the arbitration hearing that he could have sued Multiband in June 2011,[3] yet he did not file this suit until 2015. By contrast, Mattingly asserts

---

[3] Specifically, the following relevant colloquy occurred at the arbitration hearing:

Q. [by Multiband's counsel] Well, let's get the answer on the table. You could have sued in June of 2011, yes?

A. [by Mattingly] Yes.

Q. So you're telling us that you chose not to sue until you sued in 2015 after you got terminated.

A. What is your point?

Q. Is that—answer to my question is yes?

the fifteen-year limitations period in Kentucky Revised Statute (KRS) 413.090(2) for actions based upon a written contract applies.

Before determining which statute of limitations applies, we must first discern the deference we owe to the arbitrator's decision, if any. Multiband argues we should review the arbitrator's statute of limitations decision *de novo*. Multiband relies upon *DMS Properties-First, Inc. v. P.W. Scott Associates, Inc.*, 748 A.2d 389, 392 (Del. 2000), which generally holds that a Delaware court should review *de novo* an arbitrator's decision on the arbitrability of a dispute unless the parties clearly agreed to let an arbitrator determine a dispute's arbitrability, in which case the court's review is deferential. But we are not presented with a question of the arbitrability of a dispute as the agreements here plainly require arbitration. Consequently, *DMS Properties-First, Inc.* is not conclusive.

Determining the applicable statute of limitations is a question of law in Kentucky and Delaware. *Estate of Wittich By and Through Wittich v. Flick*, 519 S.W.3d 774, 776 (Ky. 2017); *Connelly v. State Farm Mutual Automobile Insurance Company*, 135 A.3d 1271, 1274 (Del. 2016). Generally, appellate courts in Kentucky and Delaware review questions of law *de novo*. *Abbott v. Cunningham*, 377 S.W.3d 565, 567 (Ky.App. 2012); *LeVan v. Indep. Mall, Inc.*,

A. That's true. What is your point?

-8-

940 A.2d 929, 932 (Del. 2007). Accordingly, we will review *de novo* the arbitrator and circuit court's potentially dispositive determination of which state's statute of limitations applies to this dispute.

Procedural matters are typically governed by the law of the forum state. *Aetna Freight Lines, Inc. v. R. C. Tway Co.*, 298 S.W.2d 293, 295 (Ky. 1956) (holding that "[m]atters of procedure are determined by the law of the forum[.]"). Indeed, though not cited by the parties, there is persuasive authority holding that "[a]bsent an express statement of intent, a choice of law provision will not be interpreted to cover statutes of limitations." *Phelps v. McClellan*, 30 F.3d 658, 662 (6th Cir. 1994). Longstanding Kentucky law similarly holds, albeit in a case with distinguishable facts, that "[a] statute of limitations does not extinguish a legal right but merely affects the remedy, and the law of the forum controls remedies and procedures." *Seat v. Eastern Greyhound Lines, Inc.*, 389 S.W.2d 908, 909 (Ky. 1965). In fact, "the general rule" is "that the forum always applies its statute of limitation." *Combs v. International Ins. Co.*, 354 F.3d 568, 578 (6th Cir. 2004). That authority weighs heavily in favor of applying Kentucky's statute of limitations.

Finally, we reject Multiband's secondary, somewhat convoluted argument that the arbitrator, and trial court, erred by not applying Kentucky's borrowing statute, KRS 413.320. As we understand it, Multiband contends that

-9-

applying KRS 413.320 would result in application of Minnesota law and, in turn,

Minnesota law would defer to Delaware's statute of limitations.

> KRS 413.320 provides:
>
> When a cause of action has arisen in another state . . . and
> by the laws of this state . . . where the cause of action
> accrued the time for the commencement of an action
> thereon is limited to a shorter period of time than the
> period of limitation prescribed by the laws of this state
> for a like cause of action, then said action shall be barred
> in this state at the expiration of said shorter period.

KRS 413.320 has not been modified since its enactment in 1942, and its language

is stilted. Nonetheless, its gist is clear—"if a cause of action arises in a foreign

jurisdiction which has a shorter statute of limitations than Kentucky for the same

cause of action, Kentucky courts must 'borrow' the foreign jurisdiction's statute of

limitations." *Combs*, 354 F.3d at 578. Thus, KRS 413.320, as a borrowing statute,

is "a legislative exception from the general rule that the forum always applies its

statute of limitation." *Id.*

KRS 413.320 does not apply here because this action arose in

Kentucky, not Minnesota. "The place where a cause of action arises is the place

where the operative facts that give rise to the action occur . . . . [I]t is the

happening of the last of such facts which brings the cause of action into

existence[.]" *Abel v. Austin*, 411 S.W.3d 728, 736 (Ky. 2013) (internal quotation

marks and citation omitted).

-10-

Multiband contends Mattingly's claims arose in Minnesota because it is a Minnesota entity and it declined Mattingly's indemnification demands from Minnesota. But Mattingly is a Kentucky resident. Multiband has not shown compelling evidence to contravene Mattingly's assertion that the indemnification agreements were formed in Kentucky; Kentucky is the forum state for enforcing the indemnification agreements and the Department of Labor investigation and resultant settlement occurred in federal court in Kentucky. Also, the settlement agreement was the last act necessary to activate the indemnification agreements since the settlement led to Mattingly expending the sum for which he wants indemnification by Multiband.[4]

In short, though our analysis differs somewhat from the arbitrator's, Kentucky's statute of limitations applies so we shall not disturb the arbitrator's conclusion that Mattingly's claims were timely.

We now turn to discerning what standard of review we shall apply to Multiband's substantive claims. Kentucky permits only extremely circumscribed, "highly deferential" judicial review of arbitration decisions. *Wagner v. Drees Co.*,

---

[4] Mattingly incurred legal expenses prior to the settlement, and the expansive scope of the indemnification agreements seemingly would have entitled him to reimbursement prior to the settlement of the Department of Labor action. But the settlement was the final triggering event for invoking the indemnification agreements.

422 S.W.3d 281, 283 (Ky.App. 2013). Multiband argues Delaware law generally provides courts with more plenary review power.

Multiband's arguments to the contrary notwithstanding, a court's ability to review an arbitrator's decision under Delaware law is also "narrowly circumscribed" since "[a]s a general rule, a decision reached by an arbitration panel is not reviewed on the merits by Delaware courts." *Travelers Ins. Co. v. Nationwide Mut. Ins. Co.*, 886 A.2d 46, 48 (Del. Ch. 2005). In fact, the Delaware Supreme Court has remarked that "review of an arbitration award is one of the narrowest standards of judicial review in all of American jurisprudence." *SPX Corp. v. Garda USA, Inc.*, 94 A.3d 745, 750 (Del. 2014) (internal quotation marks, footnote, and citations omitted).

Regarding vacating an award, Delaware law provides:

(a) Upon complaint or application of a party in an existing case, the Court shall vacate an award where:

(1) The award was procured by corruption, fraud or other undue means;

(2) There was evident partiality by an arbitrator appointed as a neutral except where the award was by confession, or corruption in any of the arbitrators or misconduct prejudicing the rights of any party;

(3) The arbitrators exceeded their powers, or so imperfectly executed them that a final

-12-

and definite award upon the subject matter submitted was not made;

(4) The arbitrators refused to postpone the hearing upon sufficient cause being shown therefor, or refused to hear evidence material to the controversy, or otherwise so conducted the hearing, contrary to the provisions of § 5706 of this title, or failed to follow the procedures set forth in this chapter, so as to prejudice substantially the rights of a party, unless the party applying to vacate the award continued with the arbitration with notice of the defect and without objection; or

(5) There was no valid arbitration agreement, or the agreement to arbitrate had not been complied with, or the arbitrated claim was barred by limitation and the party applying to vacate the award did not participate in the arbitration hearing without raising the objection;

but the fact that the relief was such that it could not or would not be granted by a court of law or equity is not ground for vacating or refusing to confirm the award.

DEL CODE ANN. tit. 10, § 5714(a) (2009).

The arbitrator's decision here, though strenuously opposed by Multiband, does not satisfy those enumerated factors. Indeed, the only listed factor Multiband actively argues is the time limitation argument contained in the fifth factor, which we have already rejected. Instead, Multiband mainly contends the arbitrator's decision was made in manifest disregard of the law.

-13-

Despite some cases stating that the grounds in Delaware Code Annotated, Title 10, section 5714(a) are the "only" methods by which a court may vacate an arbitration award, Delaware also permits a court to vacate an award upon concluding the arbitrator acted in manifest disregard of the law. Even though the language does not appear to be contained within any relevant statutes, Delaware courts have held that the "manifest disregard" standard is "an outgrowth of the statutory vacatur grounds for cases in which the arbitrator exceeds his powers[.]" *Travelers Ins. Co.*, 886 A.2d at 48. The Delaware Supreme Court has explained that DEL CODE ANN. tit. 10, §5714 (2009) "tracks an analogous provision in the Federal Arbitration Act (FAA)," so Delaware courts have used federal cases interpreting the FAA for guidance. *SPX Corp.*, 94 A.3d at 750. And federal authority holds that a court may vacate an arbitration award under the FAA if the arbitrator "acts in 'manifest disregard' of the law." *Id.* (citations omitted).

Showing an arbitrator manifestly disregarded the law is *exceedingly* difficult, so it is unsurprising that Delaware courts have rarely concluded that an arbitrator acted in manifest disregard of the law. *Travelers Ins. Co.*, 886 A.2d at 48. To conclude the arbitrator manifestly disregarded the law "a court must find that the arbitrator consciously chose to ignore a legal principle, or contract term, that is so clear that it is not subject to reasonable debate." *SPX Corp.*, 94 A.3d at 747. The stringency of review under the "manifest disregard" standard means that

-14-

a court may not disturb the arbitrator's decision even if the court concludes the

arbitrator made a "serious error." *Id.* (internal quotation marks and citations

omitted).

The Delaware Supreme Court forcefully hammered home the extreme

deference owed to an arbitrator's decision as follows:

> The manifest disregard standard requires a party seeking
> vacatur to prove that the arbitrator was fully aware of the
> existence of a clearly defined governing legal principle
> but refused to apply it, in effect, ignoring it. To meet this
> standard, the evidence must establish that the arbitrator
> (1) knew of the relevant legal principle, (2) appreciated
> that this principle controlled the outcome of the disputed
> issue, and (3) nonetheless willfully flouted the governing
> law by refusing to apply it.
>
> An arbitrator's awareness of the contract language,
> however, does not prove that the arbitrator knew of the
> relevant legal principle or appreciated that this principle
> controlled the outcome of the dispute. Knowledge of the
> operative legal principle and its proper application can be
> inferred only if the court finds an error that is so obvious
> that it would be instantly perceived as such by the
> average person qualified to serve as an arbitrator. [A]s
> long as the arbitrator is even arguably construing or
> applying the contract and acting within the scope of his
> authority, that a court is convinced that he committed
> serious error does not suffice to overturn his decision.

*SPX Corp.*, 94 A.3d at 750-51 (internal quotation marks, citations, and footnotes

omitted). Our review proceeds under that exacting standard.[5]

---

[5] Our ultimate conclusion to affirm the arbitrator would be the same if we applied Kentucky law.

-15-

Multiband contends the arbitrator manifestly disregarded the law by declining to enforce the release, under which Mattingly received $1,000 in exchange for releasing Multiband from its indemnification obligations. Though Delaware substantive law controls the indemnification agreements, the release provides that it "shall be governed by and construed in accordance with the laws of Minnesota, regardless of the conflict of laws rules that may be applied by the courts of Minnesota or any other jurisdiction."

Multiband relies upon the basic contract law principle that a court presumes a signatory to a contract knows its terms. Indeed, Minnesota precedent holds that "[a]bsent fraud, mistake or unconscionable terms, a party to a document cannot avoid the requirements of the document by showing he did not know its contents." *Huseman v. Life Ins. Co. of North America*, 402 N.W.2d 618, 620 (Minn. Ct. App. 1987).[6] And a court will enforce a contract, even if its terms seem harsh, *Minneapolis Public Housing Authority v. Lor*, 591 N.W.2d 700, 704 (Minn. 1999), or foolish, but not if it is unconscionable.

As explained in 11 WILLISTON ON CONTRACTS § 31:5 (4th ed. 2020) (footnote omitted), "the question whether a bargain is smart or foolish, or economically efficient or disastrous, is not ordinarily a legitimate subject of

---

[6] The same core rule generally applies in Kentucky. *Hathaway*, 336 S.W.3d at 89-90.

judicial inquiry. If freedom of contract means anything, it means that parties may make even foolish bargains and should be held to the terms of their agreements." Under the freedom to contract, neither Mattingly's claim that he did not receive/read the entire release nor the fact that it would entitle him to receive only $1,000 in return for foregoing the right to receive well over $2,000,000 would likely be sufficient to invalidate the release.

As to unconscionability, "[a] contract is unconscionable if it is such as no man in his senses and not under delusion would make on the one hand, and as no honest and fair man would accept on the other." *Matter of Estate of Hoffbeck*, 415 N.W.2d 447, 449 (Minn. Ct. App. 1987) (internal quotation marks and citation omitted). *See Dorso Trailer Sales, Inc. v. American Body and Trailer, Inc.*, 372 N.W.2d 412, 415 (Minn. Ct. App. 1985) (internal quotation marks and citation omitted) (explaining "[a] finding of unconscionability requires that one contracting party show that it had no meaningful choice but to accept the contract term as offered, and that the termination clause was unreasonably favorable to the other party."). While Minnesota would not require compliance with an unconscionable contract, the parties have not shown that Mattingly had no meaningful choice but to enter into the release, so it cannot properly be invalidated upon unconscionability grounds—even though the release entitled Mattingly to only $1,000 in return for foregoing indemnification claims worth exponentially more.

But under Minnesota law, "[a] release is invalid if the party executed the release under circumstances showing the release was not intended or if the party did not receive sufficient consideration." *Sorensen v. Coast-to-Coast Stores (Central Organization), Inc.*, 353 N.W.2d 666, 669 (Minn. Ct. App. 1984). Such a conclusion is logical since a valid contractual agreement requires a meeting of the minds and no true meeting of the minds occurred if one party to what purports to be a release did not actually intend to release anything.

There was evidence from which the arbitrator could reasonably have concluded that Mattingly never intended to release his indemnification rights, despite having signed a document purporting to do just that. For example, as recounted in the arbitration transcript, Mattingly answered "no" when asked at the arbitration if he had "know[n] that it [the release] was releasing any rights you had" and again answered in the negative when asked if he had "know[n] it [the release] related in some way or other to indemnification[,]" and a third time answered in the negative when asked if he "believe[d] that it [the release] had anything to do with indemnification[.]" Mattingly also averred in an affidavit that Multiband's management had told him that even if he signed the purported release "Multiband would still be obligated to reimburse me the amount of my settlement and out of pocket fees and expenses but would do so prior to the termination of my employment contract."

Mattingly asserts that he signed the release without seeing the whole document based upon oral assurances from Multiband that it would eventually honor the indemnification agreements, regardless of what the document stated. The gist is that Multiband agreed it would eventually honor its indemnification obligations but did not want to list them on a required governmental disclosure form so as to try to avoid impacting its valuation. James Mandel, Multiband's former CEO, submitted an affidavit buttressing Mattingly's assertion as follows:

> In June 2011, Multiband, by and through Mr. Bell [Multiband's chief financial officer] and/or me, communicated to Mr. Mattingly that if Mr. Mattingly would sign a document purporting to release or waive his indemnification rights against Multiband, that Multiband would pay the indemnity obligations to Mr. Mattingly at a later time, likely in connection with his employment contract. To the extent that Mr. Mattingly contends that he signed a document purporting to release or waive any indemnification rights against Multiband in June 2011 because he was led to understand that Multiband would make good on the obligation to him at a later date, I believe he is being truthful because that is the information Multiband intended to convey to him.

Multiband's insistence that Mattingly released his indemnification claims is not facially unmeritorious. Indeed, Mattingly signed a release which contains language expressly foregoing his indemnification rights. However, the prism through which we must view the matter is whether the arbitrator manifestly disregarded the law by concluding that the release was not enforceable. The arbitrator's conclusion is supported by the aforementioned evidence showing that

-19-

Mattingly never truly intended to release his indemnification rights, which would make the release unenforceable. Given the conflicting evidence, Multiband has not—indeed, could not have—demonstrated that the arbitrator "willfully flouted" applicable law or made a conscious decision to "ignore a legal principle, or contract term, that is so clear that it is not subject to reasonable debate." *SPX Corp.*, 94 A.3d at 747-50 (internal quotation marks, citations, and footnotes omitted).

Finally, the arbitrator found that "[a]t worst, the evidence, particularly the affidavits of Mattingly and Mandel, shows that the parties engaged in a transaction which was designed to mislead or hide from the public the existence of the indemnity claim." Thus, the arbitrator found that "[e]ach party stood to gain through the execution of a false and deceptive document, and thus were *in pari delicto*; as such, neither party should be granted any relief on this single issue." Multiband argues the arbitrator manifestly ignored the law governing the *in pari delicto* doctrine.

We question whether we need to address Multiband's *in pari delicto* doctrine argument since, as we understand it, the arbitrator only applied the *in pari delicto* doctrine as an alternate or secondary reason to decline to enforce the release. Because we have concluded the arbitrator's main rationale was proper, it

is likely not strictly necessary for us to determine the propriety of the arbitrator's

secondary rationale.  Nonetheless, we will succinctly address the issue.

*In pari delicto* means "[e]qually at fault[.]"  BLACK'S LAW

DICTIONARY (11th ed. 2019).  The "*in pari delicto* doctrine" is "[t]he principle that

a plaintiff who has participated in wrongdoing may not recover damages resulting

from the wrongdoing."  *Id.*  Under the leading Minnesota case, the doctrine was

explained as being "based upon judicial reluctance to intervene in disputes between

parties who are both wrongdoers in equal fault," and that reluctance applies to both

"an illegal contract" and "tortious transmissions [presumably "transactions"] based

upon fraud or similar intentional wrongdoing" such that "anyone who engages in a

fraudulent scheme forfeits all right to protection, either at law or in equity."  *State*

*by Head v. AAMCO Automatic Transmissions, Inc.*, 199 N.W.2d 444, 448 (Minn.

1972) (internal quotation marks and citation omitted).

As explained in *In re American International Group, Inc.,*

*Consolidated Derivative Litigation*, 976 A.2d 872, 882 (Del. Ch. 2009) (internal

quotation marks, citations, and footnotes omitted):

> Delaware, like most American jurisdictions and our
> federal common law (where applicable), embraces to
> some extent the venerable in pari delicto doctrine.  Latin
> for 'in equal fault,' in pari delicto is a general rule that
> courts will not extend aid to either of the parties to a
> criminal act or listen to their complaints against each
> other but will leave them where their own act has placed

them. The underlying idea is that there is no societal interest in providing an accounting between wrongdoers.

*See also Stewart v. Wilmington Tr. SP Services, Inc.*, 112 A.3d 271, 302 (Del. Ch. 2015) (explaining "[*i*]n pari delicto serves at least two important policy goals: deterring wrongful conduct by refusing wrongdoers any legal or equitable relief, and protecting the judicial system from having to use its resources to provide an accounting among wrongdoers.").[7]

According to Mulitband, application of *in pari delicto* should have resulted in denial of Mattingly's claims because leaving the parties in their prelitigation positions would have resulted in Mattingly not receiving indemnification relief as he had not received indemnification prior to filing suit. But though Mattingly sought to enforce the indemnification agreements, Multiband sought to use the release to thwart Mattingly's contractual rights. And there is evidence that the release was improper, if not illegal, since it consciously was designed to help Multiband not provide full and accurate information on disclosure form(s). In other words, absent the release, the prelitigation status of the parties was that Multiband owed contractual indemnification obligations to Mattingly but

---

[7] Kentucky has long recognized the same core tenets. *See, e.g.*, *Damron v. Call*, 225 Ky. 150, 7 S.W.2d 1069, 1069 (1928) (explaining "Courts of equity do not lend themselves to the aid of wrongdoers who are in pari delicto. They will neither enforce an executory contract nor relieve from the consequences of an executed contract founded upon an illegal consideration, if the parties be in pari delicto. They will leave them where they have placed themselves.").

refused to honor them. Multiband sought to change the prelitigation *status quo* by trying to use the release to circumvent its contractual obligations to Mattingly. In short, Multiband has not shown that arbitrator's application of the *in pari delicto* doctrine constitutes manifest disregard of the law. And even if there was any error in the arbitrator's terse *in pari delicto* analysis, it would have been harmless since the arbitrator did not act in manifest disregard of the law by concluding that the release was unenforceable because Mattingly had not intended to release Multiband from its indemnification obligations.

For the foregoing reasons, the Mason Circuit Court is affirmed.

ALL CONCUR.

BRIEFS FOR APPELLANT:

Brian M. Gudalis
John O. Hollon
Alexandra DeMoss-Campbell
Zachary H. Damron
Lexington, Kentucky

Robert M. Palumbos
Andrew R. Sperl
Philadelphia, Pennsylvania

BRIEF FOR APPELLEE:

P. Douglas Barr
Dana R. Howard
Lexington, Kentucky