Filed 6/29/21

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| JP-RICHARDSON, LLC,<br><br>    Plaintiff and Appellant,<br><br>        v.<br><br>PACIFIC OAK SOR RICHARDSON PORTFOLIO JV, LLC F/K/A KBS SOR RICHARDSON PORTFOLIO JV, LLC,<br><br>    Defendant and Respondent. | G059479<br><br>(Super. Ct. No. 30-2019-01116916)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, James J. Di Cesare, Judge.  Affirmed.

Holmgren Johnson, Mitchell Madden and Dennis M. Holmgren for Plaintiff and Appellant.

DLA Piper, David Farkas and Alexander Wolf for Defendant and Respondent.

JP-Richardson, LLC (JP) appeals from a judgment confirming an arbitration award in favor of Pacific Oak SOR Richardson Portfolio JV, LLC F/K/A KBS SOR Richardson Portfolio JV, LLC (Pacific Oak) in a business dispute. Pacific Oak removed JP as the managing member of a joint venture real estate company. JP initiated arbitration, seeking to be reinstated as the managing member. The arbitrator determined Pacific Oak's decision to remove JP was justified, and JP owed over $1 million (the cost of arbitration). On appeal, JP argues the trial court erred by denying its petition to vacate the award and by granting Pacific Oak's motion to confirm the award. Concluding JP's contentions lack merit, we affirm the judgment.

FACTS

I. *The Joint Venture/Arbitration Agreement*

In 2011, JP and Pacific Oak entered into an agreement (Agreement) to create a company, JP-KBS Richardson Holdings, LLC (the Joint Venture or JV), to acquire, develop, and manage commercial real estate in Texas. The Agreement contained the following arbitration provision: "<u>Arbitration</u>. . . . [A]ny controversy or dispute arising out of this Agreement . . . or the action or inaction of any Member or Managing Member hereunder . . . shall be submitted to arbitration . . . before a . . . judge . . . selected by JAMS, Inc. . . . Any award or decision obtained from any such arbitration proceeding shall be final and binding on the parties, and judgment upon any award thus obtained may be entered in any court having jurisdiction thereof."

JP, a real estate developer, was the Joint Venture's managing member. Its contractual responsibilities ranged from obtaining government permits, to keeping Pacific Oak informed "of material information" relating to the company's property. JP's manager and principal executive was Mark Jordan.

Relevant to this case, the Agreement included a provision authorizing Pacific Oak to remove JP as the managing member for a "Just Cause Event." The events

2

were defined as follows: "For purposes of this Section 2.06(b), 'Just Cause Event' shall mean:

"(i) JV Member or any principal, officer, executive or employee of JV Member has committed fraud related to the Company, a Property Owner or a Project or has embezzled funds of the Company or a Property Owner.

"(ii) JV Member or any principal, officer, executive or employee of JV Member has committed an act of gross negligence or willful misconduct in the performance of its obligations under this Agreement.

"(iii) JV Member has materially breached its obligations as Managing Member under this Agreement and such breach was not timely cured within thirty (30) days of written notice from Co-Managing Member.

"(iv) The filing of any bankruptcy, insolvency or receivership proceedings affecting JV Member which is not dismissed within ninety (90) days, or any assignment for the benefit of creditors by JV Member."

II. *JP's Removal as Managing Member*

In 2012, Jordan, acting for the Joint Venture, sought various permits, entitlements, and zoning changes from the City of Richardson, Texas. In the process, Jordan interacted with government officials, including Richardson's mayor, Laura Maczka. Jordan and Maczka developed a personal and financial relationship.

In 2015, a federal grand jury considered allegations of political corruption involving Jordan and Maczka. The indictment filed in May 2018, alleged conspiracy, wire fraud, and bribery. It asserted that for two years Maczka and Jordan conspired to use Maczka's official position "to benefit and enrich themselves through bribery." Specifically, in "exchange for Maczka's favorable support and votes regarding [a desired housing development for the Joint Venture called the Palisades Property] Jordan offered and gave to Maczka, and Maczka accepted: monetary payments, which caused interstate wire communications, payments for renovations of Maczka's residence, luxury hotel

3

stays, flight upgrades, meals, lucrative employment with one of Jordan's companies that involved the Palisades Property, intimate sexual contact, and other personal benefits and things of value."

Jordan did not tell Pacific Oak that he was the target of a federal criminal investigation arising from his performance of JP's duties for the Joint Venture. When Pacific Oak learned about the investigation in 2017, it removed JP as managing member.

III. *Arbitration Proceedings*

Within a month after being removed, Jordan/JP initiated arbitration proceedings, seeking declaratory relief and raising claims for breach of contract and breach of the implied covenant of good faith and fair dealing. Pacific Oak filed an answer and counterclaims, alleging breach of fiduciary duty, aiding and abetting breach of fiduciary duty, breach of contract, fraud, and declaratory relief.

Justice Carlos Moreno (Ret.), a JAMS emergency procedures arbitrator, considered and denied JP's request for expedited injunctive relief. The parties selected Justice Richard D. Aldrich (Ret.) as their arbitrator of the dispute.

A. *Discovery Dispute & Adverse Inferences*

JP did not comply with the arbitrator's orders to produce documentary discovery. Jordan invoked his Fifth Amendment right against self-incrimination during his deposition.

In December 2018, the arbitrator granted Pacific Oak's motion asking the arbitrator to draw adverse inferences on certain factual issues. The arbitrator prepared a lengthy order, writing the following: "This arbitration is now one year old, the demand having been filed on January 10, 2018. Since its filing[,] this matter has had a convoluted and tortured discovery history due to . . . Jordan's unwillingness to engage in discovery. . . . It has taken several orders from the [a]rbitrator before . . . Jordan actually gave his deposition but only after the [a]rbitrator had to issue a subpoena compelling his attendance. The arbitrator has read the entire deposition transcript and notes that . . .

4

Jordan invoked his [Fifth] Amendment [p]rivilege to each and every question that was probative of his personal relationship with . . . Maczka while she was the Mayor of Richardson, Texas and a voting member of the City Council. It is this relationship that is the basis for JP's termination by [Pacific Oak]. It is undisputed that during this period, JP was a managing partner of the Joint Venture and . . . Jordan was the managing partner of JP. When this [a]rbitration began, . . . Jordan was under federal investigation for his personal relationship with Mayor Maczka at a time when the Joint Venture was seeking certain concessions and permits from the City of Richardson. . . . [¶] Shortly after this arbitration commenced, . . . JP filed a motion to abate this proceeding on the grounds of the ongoing federal investigation into Jordan's relationship with Mayor Maczka. That motion was denied by the [a]rbitrator." (Fn. omitted.)

The arbitrator noted JP renewed its motion to abate in May 2018, after the grand jury issued an indictment against Jordan on "seven counts of violating federal law." The arbitrator explained he granted this motion because he recognized there had been a material change in circumstances. He also stayed all discovery, "realizing that Jordan's Fifth Amendment Rights would undoubtedly be implicated." However, the arbitrator said he changed his mind after Jordan "sought to circumvent the stay by (1) appointing his brother John Jordan (Brother) as the co-managing member of JP . . . and (2) directing or allowing [Brother] to file an extensive document production request . . . ." The arbitrator dissolved the stay and ordered the parties to cooperate in good faith with document discovery. He noted either party could claim a privilege and prepare a privilege log describing the protected documents. The arbitrator noted Jordan failed to comply with his June 2018 discovery orders.

In his written order, the arbitrator noted that in October and November 2018, Pacific Oak filed three motions seeking sanctions due to JP's noncompliance with discovery. In January 2019, Pacific Oak filed its fourth notice. The arbitrator also considered the federal magistrate judge's order describing the limits to its protective

5

order. The judge defined "'[p]rotected [d]iscovery [m]aterials'" as including items "which 'contain sensitive and private personal identification and financial information for a[ny] individuals, including names, addresses, social security numbers, date of births, bank account information and tax information.'" The magistrate's order clarified materials not deemed protected were subject to disclosure in civil proceedings. Based on all of the above information, the arbitrator reached the following conclusion: "Had Jordan wanted to cooperate with opposing counsel in this arbitration, he could have done so by merely redacting the 'protected discovery information' and disclosed the rest. Again he failed to do so."

The arbitrator also discussed the problems caused by Jordan's deposition. It explained JP initiated the arbitration, but Pacific Oak could not defend itself due to JP/Jordan's refusal to participate in discovery. Moreover, the federal indictment sought forfeiture of "all advantages received by the Joint Venture as a result of Jordan's activities while he was the managing partner[, which] unquestionably place[d] the Palisades Project and its land in jeopardy."

Finally, the arbitrator discussed legal authority regarding the possible remedies available when a party seeks the benefits of arbitration but is unwilling to disclose any information, effectively "insulat[ing] himself and his company from scrutiny[.]" He concluded, "Here, we have a unique case wherein it is the [c]laimant who has asserted his Fifth Amendment privilege against testifying whereas in most of the case law it is the defendant making the claim." He noted Jordan made clear during his deposition he would not answer any questions about his relationship with Maczka and in return Pacific Oak clearly signaled it would be asking that adverse inferences be drawn from his refusal to answer questions based upon the Fifth Amendment. Moreover, Jordan acknowledged, "he and his personal attorney, his corporate attorney, and his criminal defense attorney [were] present at the deposition, [and] all . . . explained that adverse

inferences could be drawn from Jordan's refusal to answer questions." The arbitrator concluded adverse inferences were warranted.

The court determined that in light of Jordan's history of noncooperation with discovery, which "made it unnecessarily difficult for [Pacific Oak] to defend itself . . . in an arbitration that was commenced by JP," the following adverse inferences were reasonable:

(1) Jordan "did not disclose to anyone . . . that he in fact purchased $74,000, worth of [f]urniture for Maczka" and had a personal relationship with her.

(2) Jordan was aware Maczka failed to disclose material facts in her conflicts statements, such as the purchase of $74,000 worth of furniture and other gifts, and this omission put the Joint Venture's assets at risk.

(3) Jordan was aware his "personal relationship with Maczka and his gifts to her put the assets of the Joint Venture at risk."

(4) "[Jordan] undertook efforts to conceal things of value that were accepted by [Maczka] to conceal a corrupt relationship" with her. He "made false statements to others, including the IRS, related to things of value that he offered to and gave to . . . Maczka." He did not tell Pacific Oak that he offered, or gave, valuable items to Maczka.

(5) In 2013, Jordan paid for travel and provided cash to Maczka. He did not tell Pacific Oak about the payments or disclose any of these expenses in financial reports. Jordan understood, "the exchange in value with [Maczka] would have a direct effect" and be "relevant" to the Joint Venture.

(6) On December 23, 2014, Jordan had a contractor create a fraudulent invoice for $24,030.02 "purporting to be for work performed for either the Joint Venture or one of the . . . affiliates" but it was for one of Jordan's commercial properties in Texas. Jordan passed the costs associated with this invoice to the Joint Venture and wrongfully refused to produce a copy of the invoice in arbitration.

7

(7) Jordan knew that in January 2015, Maczka falsely represented herself as the then human resources manager at Sooner National Property Management (Sooner Management). He did not disclose this fact to Pacific Oak.

(8) Jordan admitted if there was a criminal conviction in the pending criminal case, those acts of fraud constituted a "'just cause'" event relevant to his removal.

(9) During his deposition, Jordan identified exhibit No. 8 as a conflict of interest questionnaire. Jordan reviewed this document before it was filed. The document was incomplete, contained "false and misleading statements," and was "materially false."

B. *A Change in Circumstances & Summary Disposition*

In May 2018, federal authorities charged Jordan with multiple felonies relating to his relationship with the mayor and his work for the Joint Venture. A jury convicted him of all counts on March 7, 2019.

In April 2019, the arbitrator entered a summary disposition order against JP, and in favor of Pacific Oak. The arbitrator stated Pacific Oak filed a motion for summary disposition based on (1) Jordan's recent conviction for multiple federal felonies, and (2) the arbitrator's prior order imposing multiple adverse inferences against Jordan. In his order, the arbitrator determined multiple "Just Cause Events" occurred, justifying Pacific Oak's removal of JP as the Joint Venture's managing member. Specifically, he cited to section 2.06 (b)(i) [fraud] and (b)(ii) [negligence or willful misconduct] of the Agreement. The arbitrator awarded attorney fees and costs pursuant to section 10.02 of the Agreement.

C. *Motion for Reconsideration*

In May 2019, the federal court vacated Jordan's felony conviction after it discovered a jury member conversed with a court employee. The court rejected Jordan's request for an acquittal notwithstanding the jury's verdict and rescheduled Jordan's trial for two months later.

Thereafter, JP filed a motion for reconsideration of the arbitrator's award. JP asserted that because Jordan's conviction was vacated there were no longer grounds to remove it as managing member. It argued the adverse inferences were insufficient to support the arbitrator's award.

The arbitrator denied the motion. He concluded evidence presented at the trial, in addition to the adverse inferences, supported the award. The arbitrator referred to Sarah Catherine Norris's testimony as being highly probative on the issue of Jordan and Maczka's relationship. Norris, a partner in Sooner Management, performed accounting duties and she contacted the FBI after she noticed Jordan was making suspicious payments for trips, hotels, and meals. The arbitrator also mentioned testimony from Peter Smith, a municipal attorney for the City of Richardson. Smith testified Jordan's gifts were not properly disclosed in violation of municipal requirements. The arbitrator found relevant the testimony of Kristin Worman, Deputy General Counsel of the Texas Real Estate Commission. She testified Jordan violated state law and ethical rules by paying Maczka to lease out Joint Venture property without the appropriate licensing.

Finally, in making his ruling, the arbitrator examined the language of the federal court's order. He determined it was highly relevant that the order specifically rejected Jordan's request for an acquittal. The arbitrator concluded there was nothing to suggest there was any issue with the merits of the charges against Jordan. The court set aside the verdict due to improper juror contact not lack of evidence.

The arbitrator wrote the following concluding remarks: "The implications for the Palisades Project and to [Pacific Oak] from Jordan's misconduct with Mayor Maczka are grave. The trial was extensively covered by the newspapers and television news media. The reputation of the individuals involved in the Palisades Project, including [Pacific Oak] who has a 90 [percent] stake in the project has been severely damaged. The fact there will be a retrial with its attendant publicity only makes matters worse for the Joint Venture. The assets of the Joint Venture have clearly been placed in

9

jeopardy and put under a cloud of suspicion. Therefore, the fact of a grand jury investigation and a trial where witnesses testified at length of Jordan's misdeeds as manager of the Joint Venture and the adverse inferences previously found the [a]rbitrator, are more than enough to find that a 'just cause' event occurred justifying . . . terminating JP as the managing partner . . . . [¶] The [m]otion for [r]econsideration is DENIED."

In November 2019, the arbitrator entered his final award regarding costs and fees. He determined Pacific Oak was entitled to recover its costs of $88,838.93 and attorney fees of $1,127,826.26. JP did not seek reconsideration of this award.

IV. *Trial Court Proceedings*

In December 2019, JP filed a petition to vacate the award. Pacific Oak opposed the petition and filed a cross-petition to confirm the arbitration award. The court confirmed the arbitration award. It determined JP's arguments could not be reviewed by a trial court. It also rejected JP's assertion the award was procured by corruption, fraud, or undue means.

DISCUSSION

I. *Applicable Legal Principles*

The Agreement specified its provisions "shall be construed and enforced in accordance with the law of the State of Delaware." The arbitration clause stated any dispute shall be submitted to arbitration in Orange County, California before a retired superior court judge or appellate court justice selected by JAMS. However, the arbitrator must apply the "substantive law of the State of Delaware or Federal substantive law if germane in such proceeding."

In Delaware, courts determine whether to vacate or confirm an arbitration award using cross-motions for summary judgment. "[O]rdinarily 'a summary judgment motion provides an appropriate judicial mechanism for reviewing an arbitration award, because the complete record is before the court and no *de novo* hearing is permitted to determine whether one of the five statutory exceptions is applicable.'" (*Beebe Medical*

10

*Center, Inc. v. InSight Health Services Corp.* (Del. Ch. 1999) 751 A.2d 426, 431, fn. omitted.)  This is true under either the Delaware Uniform Arbitration Act or the Federal Arbitration Act (FAA)." (*TD Ameritrade, Inc. v. McLaughlin, Piven, Vogel Securities, Inc.* (Del. Ch. 2008) 953 A.2d 726, 730-731, fn. omitted (*TD Ameritrade*).)

As in California, Delaware considers review of an arbitration award as "'one of the narrowest standards of judicial review in all of American jurisprudence.'" (*SPX Corp. v. Garda USA, Inc.* (Del. 2014) 94 A.3d 745, 750, fn. omitted (*SPX*).) "Arbitration awards . . . are not lightly disturbed, and '[c]ourts must accord substantial deference to the decisions of arbitrators.'  When considering 'whether the arbitrator exceeded its authority,' the [c]ourt must 'resolve all doubts in favor of the arbitrator.' . . . Moreover, there is a presumption that the arbitration panel acted within the scope of its authority, and 'this presumption may not be rebutted by an ambiguity in a written opinion.'  To successfully convince the Court to vacate the award of an arbitration panel, the movant must show 'something beyond and different from a mere error in the law or failure on the part of the arbitrators to understand or apply the law.' . . . This [c]ourt has also noted . . . that '[i]t is recognized that inaccuracies as to the law or facts are possible and their existence is accepted implicitly be an agreement to submit the dispute to arbitration.'  In sum, 'the [c]ourt is *not to pass an independent judgment on the evidence or applicable law*,' and '[i]f any grounds for the award can be inferred from the facts on the record, the [c]ourt must presume that the arbitrator did not exceed his authority and the award must be upheld.'" (*TD Ameritrade, supra,* 953 A.2d 726 at pp. 732-733, italics added, fns. omitted.)

"Under § 5714(a)(3) of the Delaware Arbitration Act, an arbitration award will be vacated when '[t]he arbitrators exceeded their powers, or so imperfectly executed them that a final and definite award upon the subject matter submitted was not made.'  Section 5714 tracks an analogous provision in the [FAA], and Delaware courts have found that 'federal cases interpreting this section are most helpful.'  [¶] Under the FAA,

vacatur is authorized where the arbitrator acts in 'manifest disregard' of the law.  The manifest disregard standard requires a party seeking vacatur to prove that the arbitrator was 'fully aware of the existence of a clearly defined governing legal principle but refused to apply it, in effect, ignoring it.'  To meet this standard, the evidence must establish 'that the arbitrator (1) knew of the relevant legal principle, (2) appreciated that this principle controlled the outcome of the disputed issue, and (3) nonetheless willfully flouted the governing law by refusing to apply it.'" (*SPX, supra,* 94 A.3d at p. 750, fns. omitted.)

"Knowledge of the operative legal principle and its proper application can be inferred only 'if the court finds "an error that is so obvious that it would be instantly perceived as such by the average person qualified to serve as an arbitrator."'  '[A]s long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced that he committed serious error does not suffice to overturn his decision.'" (*SPX, supra,* 94 A.3d at p. 751, fns. omitted.)  For example, when parties submit "two colorable interpretations" of a contract provision to the arbitrator, and the arbitrator adopts one that may have been wrong, the award should not be vacated under the manifest disregard standard.  (*Ibid.,* fns. omitted.)  "That interpretation may have been wrong, but it was not without a basis in the contract and the parties' submissions." (*Ibid.*)

II.  *Legal Error*

JP argues the award should be vacated because the arbitrator manifestly disregarded the law in the following three ways:  (1) by relying on a vacated jury verdict regarding a non-party as collateral estoppel; (2) by basing the award on unsupported adverse inferences; (3) by failing to enforce the Agreement's notice requirement; and (4) "by determining a removal event in the complete absence of evidence establishing same." We will address each purported "manifest disregard of the law" claim separately.  Before

12

doing so, we compliment the arbitrator on providing a thorough and well-reasoned award and orders.

A. *Vacated Jury Verdict*

JP argues the award "was expressly based" on a conviction vacated in May 2019. JP discusses the concept of collateral estoppel, correctly asserting that under both California and Delaware law, this legal doctrine requires a final judgment on the merits. (See *Lucido v. Superior Court* (1990) 51 Cal.3d 335, 342; *Norman v. State* (Del. 2009) 976 A.2d 843, 868.) JP notes he advised the arbitrator there was no final judgment because the federal court ordered a new trial. JP states he advised the arbitrator the collateral estoppel doctrine required a final judgment "yet he willfully flouted the law by refusing to apply it." We reject this contention, in part, because the award was based on evidence other than the vacated fraud conviction. In addition, JP's argument misconstrues the record because there was no evidence the arbitrator willfully ignored legal authority regarding the doctrine of collateral estoppel.

We turn first to the question of what evidence supported the arbitration award. JP's argument overlooks the procedural history of this case, in that the arbitrator reconsidered its initial April 2019 arbitration award, after the court vacated the fraud conviction. The arbitrator concluded there were reasons, other than the conviction, to uphold the award.

In the original award, the arbitrator applied the collateral estoppel doctrine and relied, in part, on the jury's fraud verdict. He explained fraud was one of the grounds specified in the Agreement justifying JP's removal. At the time, no one disputed the court's application of the collateral estoppel doctrine. Rather, JP's objection to using the conviction was its theory the verdict was an insufficient reason for removal because there also needed to be evidence Jordan's fraudulent conduct damaged Pacific Oak. In the award, the arbitrator considered and rejected this argument. He reasoned Pacific Oak

13

was not seeking to prove an action for fraud, only that fraud warranted JP's removal as the managing member.

JP fails to explain why the arbitrator's reliance on collateral estoppel, in issuing the original award, demonstrated a manifest disregard of the law. In addition, JP overlooks that the arbitrator specifically stated in the original award that there were "further and independent grounds" for entering judgment in Pacific Oak's favor. Specifically, the arbitrator discussed the numerous adverse inferences in the case, following Jordan's refusal to answer questions or participate in discovery. He concluded these inferences supported the conclusion JP committed acts of gross negligence or willful misconduct (grounds for removal under section 2.06(b)(ii) of the Agreement).

After learning the fraud verdict was vacated, the court did not apply the collateral estoppel doctrine. Instead, the arbitrator reconsidered the matter and issued a ruling that adjusted the factual basis supporting the award. He focused on the evidence of gross negligence and willful misconduct (arising from the adverse inferences and trial testimony). He also examined the reasons why the federal court vacated Jordan's conviction. He concluded the incident of juror misconduct warranted a new criminal trial but did not diminish the value of the trial testimony that further supported the arbitrator's previously found adverse inferences. The arbitrator concluded that without evidence of the fraud conviction there was still "more than enough" to warrant JP's removal. After reviewing the arbitrator's written orders and award, we conclude JP's contention the arbitrator willfully flouted the law regarding collateral estoppel lacks merit.

B. *Adverse Inferences*

JP asserts that after the federal court vacated Jordan's fraud conviction, the "sole remaining rationale" for the arbitrator's award was the impermissible adverse inferences entered against JP based on Jordan's assertion of his Fifth Amendment privilege. JP asserts the arbitrator should not have imposed or relied on adverse inferences. It maintains the arbitrator was aware of but ignored Supreme Court authority

14

holding adverse inferences were not enough to establish liability. (Citing *Baxter v. Palmigiano* (1976) 425 U.S. 308, 317 (*Baxter*). JP misconstrues the record and the *Baxter* case.

The arbitrator did not ignore Supreme Court authority. To the contrary, in both the original award and the order denying JP's reconsideration motion, the arbitrator discussed the *Baxter* case. He noted the Supreme Court considered the narrow issue of using adverse inferences drawn from an inmate's silence during a prison disciplinary hearing. (*Baxter, supra,* 425 U.S. at p. 318.) He determined the case did not support JP's position about the arbitrator relying on adverse inferences in a civil action. To the contrary, the arbitrator concluded the case supported his decision to impose adverse inferences after Jordan invoked his Fifth Amendment rights at his deposition.

As correctly noted by the arbitrator, the Supreme Court in the *Baxter* case recognized a jury cannot draw a negative inference from a defendant's invocation of his right against self-incrimination in a criminal case, but it concluded a prison disciplinary hearing was not the same as a criminal proceeding. (*Baxter, supra,* 425 U.S. at p. 316.) The arbitrator cited the Supreme Court's statement the constitution does not preclude the use of adverse inferences in civil cases. (*Id.* at p. 318.) Specifically, the Supreme Court determined, "Our conclusion is consistent with the prevailing rule that the Fifth Amendment does not forbid adverse inferences against parties to *civil actions* when they refuse to testify in response to probative evidence offered against them: the Amendment 'does not preclude the inference where the privilege is claimed by a *party to a Civil cause.*' [Citation.]" (*Ibid.,* first italics added.) The arbitrator also cited authority discussing the use of adverse inferences in civil cases. (See *S.E.C. v. Graystone Nash, Inc.* (3d Cir. 1994) 25 F.3d 187, 190 ["Use of the privilege in a civil case may, therefore, carry some disadvantages for the party who seeks its protection"].)

As mentioned, the "manifest disregard of the law" standard requires a party seeking to vacate an arbitration award to prove the arbitrator was aware of a clearly

15

defined and governing legal principle but ignored it. The record shows the arbitrator was not only aware of the Supreme Court authority, but also interpreted and applied the case. Accordingly, the arbitrator did not manifestly disregard the law by relying, in part, on adverse inferences in entering the final award.

C. *Notice Requirement*

JP maintains the arbitrator "willfully chose not to follow the law regarding breach of the [Joint Venture's] Agreement . . . which required notice." Specifically, JP points out that section 2.06(b)(iii) of the Agreement required notice and an opportunity to cure. JP cites to two unpublished Delaware case law holding notice and cure provisions cannot be ignored. JP concludes Pacific Oak failed to submit "evidence that it sent a notice of any claimed violation with a cure right[, but rather,] sent the removal notice." JP asserts the arbitrator's award should be vacated because he disregarded basic rules of contract and "rewrote the parties' agreement."

As mentioned, section 2.06(b) of the Agreement sets forth four separate circumstances that could trigger removal of a managing member. JP's lack of notice argument refers only to the third possible "Just Cause Event." Section 2.06(b)(iii) permits removal if a "JV Member has materially breached its obligations as Managing Member" and "such breach was not timely cured within thirty (30) days of written notice from Co-Managing Member." However, the arbitrator did not rely on this particular "event" in his award. He concluded removal was warranted under the events described in section 2.06(b)(i) [fraud] and (b)(ii) [negligence/misconduct]. The arbitrator would have needed to rewrite the contract to insert notice/cure rights into those two provisions.

Section 2.06(b)(iii) is the only provision requiring notice and time to cure. With respect to the "Just Cause Event[s]" found in section 2.06(b)(i) and (b)(ii), the member is not contractually afforded additional time to cure bad behavior. (See section 2.06(b)(i)(ii).) The only other listed "Just Cause Event" is section 2.06(b)(iv), which permits removal if a bankruptcy, insolvency, or receivership is not dismissed within 90

16

days.  This provision does not require notice but gives the member three months to address the "event" justifying removal.  Given the different times to cure specified in section 2.06(b)(iii) and (iv), there would be absolutely no legal justification for inferring the parties intended for there to be identical notice/cure requirements for all the listed removal "events."  Basic rules of contract interpretation do not support JP's argument the arbitrator should have required Pacific Oak to submit evidence it gave notice and an opportunity to cure.  "'It is widely recognized that the courts are not at liberty to revise an agreement under the guise of construing it.  Neither abstract justice nor the rule of liberal interpretation justifies the creation of a contract for the parties which they did not make themselves.' [Citations.]"  (*Series AGI West Linn of Appian Group Investors DE, LLC v. Eves* (2013) 217 Cal.App.4th 156, 164.)  For all the above reasons, we reject JP's contention the arbitrator manifestly disregarded contract law or rewrote the parties' Agreement by not imposing notice/cure requirements in this case.

D.  *Removal Event*

JP asserts the arbitrator "rewrote the Agreement or manifestly disregarded the law in entering its [a]ward because [Pacific Oak] failed to introduce any evidence of damages to the [Joint Venture] as required by law, see *A & J Capital, Inc. v. Law Office of Krug* (Del. Ch. Jan. 29, 2019) 2019 WL 367176, at *1 (A & J), *judgment entered sub nom. Capital, Inc. v. Law Office of Krug* (Del. Ch. 2019)."  This argument lacks merit for several reasons.

JP appears to be asserting the arbitrator failed to follow "the law" set forth in an unpublished opinion filed by the Delaware Court of Chancery.  We appreciate Delaware courts will sometimes cite to unreported opinions.  (See *The Police Retirement System of St. Louis v. Page* (2018) 22 Cal.App.5th 336, 340, fn.2 [citations to unpublished Delaware opinions]; *Aprahamian v. HBO & Co.* (Del. 1987) 531 A.2d 1204, 1207 [unpublished opinions not necessarily stare decisis but entitled to great deference].)

17

However, the arbitration award reflects the arbitrator was aware of this case and explained why it was inapplicable.

First, the arbitrator concluded the unreported opinion was "from a trial court" and had "very little precedential authority." Second, the arbitrator disagreed with the legal analysis set forth in *A & J, supra,* 2019 WL 367176. He offered the following explanation: "[T]he trial court in *A & J* conflates two concepts: the elements of a cause of action for fraud in an action to recover damages for fraud; and fraud as a ground for terminating the [Joint Venture] Agreement that so provides. Here, [Pacific Oak,] at least at this point in time, is not seeking to prove an action for fraud to recover damages against JP. [¶] Second, while factually similar to the instant case, a careful reading of [the *A & J* case] discloses significant differences. The *A & J* court found as a matter of a failure of evidence that A & J engaged in no conduct justifying its expulsion from the joint venture. Stated another way, the trial court in *A & J* found that plaintiff had failed to prove that there were any grounds to remove *A & J as a manager of the venture.* Here, unlike *A & J,* the jury in Jordan's criminal case unanimously found Jordan guilty of fraud, which is exactly one of the grounds specified in the Agreement justifying JP's removal from the Joint Venture. The fact that the only legal authority JP was able to cite in support of its argument is an unpublished trial court opinion is telling." (Fn. omitted.)

The arbitrator's in-depth discussion of the case disproves JP's theory there was a "manifest disregard of the law." The arbitrator was fully aware of the unpublished trial court opinion, its limited precedential value, and the faults with its legal analysis. And, in any event, there was evidence Pacific Oak suffered damages from Jordan's misconduct. The arbitrator discussed evidence Jordan not only misused Joint Venture funds but also damaged the Joint Venture's reputation by the stigma of being associated with a federal fraud investigation and a well-publicized government corruption trial. The arbitrator concluded Jordan jeopardized the Joint Venture's assets, placing them under "a

18

cloud of suspicion." The arbitrator's factual determinations are final and not subject to judicial review.

The last section of JP's argument does not address an alleged disregard of the law, but rather digresses into a discussion of the evidence showing Pacific Oak became aware of the criminal investigation in 2015, but it did not remove JP until 2017. JP cites case authority explaining why inquiry notice is relevant to the elements of justifiable and reasonable reliance in a fraud claim. (See *Davis v. 24 Hour Fitness Worldwide, Inc.* (D. Del. 2014) 75 F.Supp. 3d 635, 640-641 [inquiry notice warrants summary judgment as to fraud defenses].) As stated, the arbitrator's factual conclusions, even if erroneous, are not open to review by this court. We also noticed this section of the briefing refers to alleged "facts" that are unsupported by corresponding record references. Indeed, it appears JP intended to quote from FBI notes, but failed to include the alleged statements.[1] The lack of record citations undermines JP's argument because we must disregard unsupported statements of facts. "[W]e are '"not required to make an independent, unassisted study of the record in search of error or grounds to support the judgment." [Citations.]' [Citation.] A party must refer us to the portion of the record which supports its position on appeal. 'If no citation "is furnished on a particular point, the court may treat it as waived." [Citation.]' [Citation.]" (*Supervalu, Inc. v. Wexford Underwriting Managers, Inc.* (2009) 175 Cal.App.4th 64, 79.)

II. *JAMS Rules*

In his award, the arbitrator noted he permitted a "renewed motion" for summary disposition due to a substantial change of circumstances, i.e., the recent fraud conviction and the imposition of adverse inferences regarding questions Jordan refused to

---

[1] Page 34 of the opening brief contains the following assertion: "In fact, . . . JP has obtained possession of the 302 from the FBI's interview of David Moore . . . . In the 302, Moore stated: [¶] Jordan testified in his deposition that he disclosed the FBI investigation in 2015." JP omitted Moore's statements.

answer in his deposition. JP asserts the arbitrator exceeded his authority by allowing Pacific Oak to file two motions for summary disposition. It asserts JAMS rule 18 provides the arbitrator may permit a party to file "a" motion. Missing from this argument is any legal analysis or authority holding this rule forbids arbitrators from considering a *renewed* motion, or alternatively, that violation of rule 18 automatically rendered the award invalid. It is well settled in Delaware (and California) that "[t]he failure to cite *any* authority in support of a legal argument constitutes a waiver of the issue on appeal." (*Flamer v. State* (Del. 2008) 953 A.2d 130, 134, fn. omitted (*Flamer*).) We deem this issue waived.

III. *Failure to Postpone the Arbitration*

Citing a California statute, Code of Civil Procedure section 1286.2, subdivision (a)(5), JP asserts the arbitrator should have abated or postponed the arbitration until Jordan's criminal case was over. JP notes the arbitrator initially stayed the arbitration, but changed his mind. JP asserts the arbitrator "imputed Jordan's exercise of his Fifth Amendment rights to JP, notwithstanding Jordan's resigning from being a manager of JP." It asserts the arbitrator "created an impermissible Catch-22 which justifies vacation." This argument sounds similar to the one advanced regarding the arbitrator's misapplication of and reliance on adverse inferences (after Jordan refused to testify or comply with discovery). As discussed earlier, one of the reasons this argument failed was because the arbitrator based his award on more than the adverse inferences. In addition, it is not enough for JP to assert it disagreed with the abatement ruling or believed the arbitrator's actions were unfair. We conclude this issue is waived due to JP's failure to provide legal analysis on why California law not Delaware law should apply, and why the arbitrator's refusal to postpone arbitration was a manifest disregard of the law in this case. (See *Flamer, supra,* 953 A.2d at p. 134 [waiver of issues on appeal].)

IV. *Attorney Fees*

JP maintains the attorney fee award must be vacated because (1) the arbitrator's "underlying determinations" should be vacated and (2) the arbitrator exceeded his powers and manifestly disregarded the applicable law. The first point has already been considered and rejected in this opinion. Briefing on the second point is woefully inadequate.

After discussing Delaware's case law regarding reasonable attorney fees, JP concludes the arbitrator should not have awarded over $1 million in fees, for the work of 17 different lawyers, and over $88,000 in costs for a single deposition case resolved on a dispositive motion. JP provides the following argument, "Specific and unrebutted evidence was submitted by JP that most of these fees and costs were unrecoverable. Yet, the [a]rbitrator ignored the facts, evidence, law and the parties' agreement and awarded every single dollar." These statements represent JP's entire legal analysis of this issue.

As noted above, it is simply not enough to regurgitate applicable case law and disagree with the arbitrator's findings. Factual and legal errors regarding the reasonableness of the awarded fees in arbitration are not reviewable. "To successfully convince the [c]ourt to vacate the award of an arbitration panel, the movant must show 'something beyond and different from a mere error in the law or failure on the part of the arbitrators to understand or apply the law.' . . . [I]naccuracies as to the law or facts are possible and their existence is accepted implicitly be an agreement to submit the dispute to arbitration.'" (*TD Ameritrade, supra,* 953 A.2d 726, at pp. 732-733, fns. omitted.) JP failed to meet his burden of showing the arbitrator acted in manifest disregard of the law, or that the attorney fee award was more than an alleged legal or factual error. (*SPX, supra,* 94 A.3d at p. 750.)

21

V. *Pacific Oak's Request for Attorney Fees on Appeal*

Section 10.02 of the Agreement provides for an award of attorney fees and costs to the prevailing party. Pacific Oak maintains that in addition to recovering its fees in arbitration it should be allowed to recover attorney fees and costs incurred in defending JP's appeal. Pacific Oak cites to California authority holding that as the prevailing party on appeal it is entitled to an award of attorney fees. It requests that this court "affirm with directions to the trial court to determine the amount of attorney fees" and costs to be awarded. (Citing, *Security Pacific National Bank v. Adamo* (1983) 142 Cal.App.3d 492, 498 (*Security Pacific*) [appellate court has power to award fees but better practice to have trial court decide]."

Fortunately, the laws of California and Delaware are similar with respect to the procedures for considering a petition for attorney fees incurred on appeal. In California, the preference is to delegate the task to the trial court. (*Security Pacific, supra,* 142 Cal.App.3d at p. 498.) Similarly, in all the Delaware cases we reviewed, it appears that the trial court retains jurisdiction to consider petitions and award attorney fees incurred on appeal. (See *Council of Wilmington Condominium v. Wilmington Ave. Assocs.* (Del. Super. Ct. Nov. 3, 1999) 1999 WL 1223792, at *1.) Pacific Oak, as the prevailing party in this appeal, may file a petition in the trial court requesting attorney fees.

DISPOSITION

We affirm the judgment entered after the trial court granted the petition to confirm the arbitration award. We affirm the court's order denying the petition to vacate

22

the arbitration award.  Respondent may file a petition with the trial court requesting attorney fees incurred on appeal.  Respondent shall recover costs on appeal.


                                                O'LEARY, P. J.

WE CONCUR:


MOORE, J.


FYBEL, J.