# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

DOUBLELINE CAPITAL GP LLC, DOUBLELINE GROUP LP, DOUBLELINE HOLDINGS LP, DOUBLELINE CAPITAL LP, DOUBLELINE GP HOLDINGS LP, and JEFFREY GUNDLACH,

    Plaintiffs/Counterclaim Defendants,

    v.

PHILIP BARACH, JOEL DAMIANI, MUSTAPHA BAHA AS TRUSTEE OF THE BAHA COMMUNITY PROPERTY TRUST, DANIELE W. BARACH AS TRUSTEE OF THE BARACH FAMILY LIVING TRUST, JONATHAN BARACH AS TRUSTEE OF THE J&S BARACH FAMILY TRUST, and PREMIER TRUST, INC. AND TALIA J. BARACH AS TRUSTEES OF THE TALIA J. BARACH IRREVOCABLE TRUST,

    Defendants/Counterclaim Plaintiffs.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

C.A. No. 2022-0415-PAF

## MEMORANDUM OPINION

Date Submitted: October 5, 2023
Date Decided: January 25, 2024

Thomas W. Briggs, Jr., MORRIS NICHOLS ARSHT & TUNNELL LLP, Wilmington, Delaware; Laura D. Smolowe, John M. Gildersleeve, Sara H. Worth, MUNGER, TOLLES & OLSON LLP, Los Angeles, California; *Attorneys for Plaintiffs*.

Michael A. Barlow, QUINN, EMANUEL, URQUHART & SULLIVAN, LLP, Wilmington, Delaware; Steven G. Madison, Joseph Sarles, William Pilon, QUINN,

EMANUEL, URQUHART & SULLIVAN, LLP, Los Angeles, California; *Attorneys for Defendants*.

**FIORAVANTI, Vice Chancellor**

The Defendants in this case seek to vacate an arbitration award. They contend that the arbitral panel, comprising two retired federal judges and the Managing Director of the JAMS Arbitration Practice, exceeded its authority in two respects and denied Defendants an opportunity to develop evidence for one of their claims. The Plaintiffs request an order confirming the award. They argue that the Defendants are unable to "climb [the] nearly vertical hill" that is necessary to vacate an arbitration award. *Agspring, LLC v. NGP X US Hldgs., L.P.*, 2022 WL 170068, at *3 (Del. Ch. Jan. 19, 2022). Having carefully considered the Defendants' arguments, the court concludes that the Defendants have not reached the summit. Accordingly, for the reasons that are discussed below, the court must confirm the award.

# I. BACKGROUND[1]

## A. The Parties

In February 2010, Jeffrey Gundlach, Philip Barach, Joel Damiani, and two other individuals co-founded DoubleLine Capital LP ("DLC"), a fixed-income investment management firm.[2]  In July 2010, those same individuals founded another partnership, DoubleLine GP Holdings LP ("DL GP"), to manage equity investments with incentive fees.[3]  The entities' limited partnership agreements are substantially similar in all relevant respects.[4]  DLC and DL GP also share a general partner, DoubleLine Capital GP LLC ("The General Partner").[5]  DL GP and DLC have the same limited partners, equity percentages, and officers, including their CEO, Gundlach.[6]

---

[1] DoubleLine Capital GP LLC, DoubleLine Group LP, DoubleLine Holdings LP, DoubleLine Capital LP, DoubleLine GP Holdings LP, and Jeffrey Gundlach (collectively, "Plaintiffs"), were each participants in the arbitral proceeding.  DoubleLine Capital GP LLC and Gundlach are referred to in that proceeding as "Respondents."  Likewise, Philip Barach, Joel Damiani, Mustapha Baha as Trustee of the Baha Community Property Trust, Daniele W. Barach as Trustee of the Barach Family Living Trust, Jonathan Barach as Trustee of the J&S Barach Family Trust, Inc., and Premier Trust, Inc. and Talia J. Barach as Trustees of the Talia J. Barach Irrevocable Trust (the "Defendants"), together with Susan Nichols Steinbach, advanced claims in the arbitration proceeding and are referred to as "Claimants" in the arbitral record and award.  Steinbach initially appeared as a defendant in this case but was voluntarily dismissed on March 10, 2023.  Dkt. 65.

[2] JX 39 at 5.

[3] JX 956 at 6.

[4] JX 955; JX 956.

[5] JX 955 at 68; JX 956 at 68.

[6] JX 955; JX 956.

Gundlach is the sole member of The General Partner.[7] In September 2010, The General Partner formed a board of managers comprising Gundlach, Barach, Earl Lariscy, and Ron Redell.[8] In October 2012, Gundlach and Lariscy formed DoubleLine Group LP ("DLG").[9] DLG's general partner is The General Partner, and DLG's sole limited partner is DoubleLine Holdings LP ("DLH"), of which Gundlach owns 80%.[10]

In October 2012, Gundlach hired several portfolio managers to run an equities investment business and formed DoubleLine Equity LP ("DLE").[11] DLE's general partner is The General Partner.[12]

### B. Looting Claims

The formation of DLE created a potential conflict for The General Partner when presented with opportunities that could be undertaken by DLC, DL GP, or DLE. To resolve that potential conflict, the DLC and DL GP limited partnership agreements (the "LPAs") were amended to add provisions titled "Waiver of Conflicts of Interest," which read as follows:

---

[7] Defs.' Opening Br. Tab 18 ¶ 6.

[8] *Id.* ¶ 11.

[9] JX 262 at 4.

[10] *Id.* ¶ 4.

[11] Defs.' Opening Br. Tab 18 ¶ 35.

[12] JX 2196 at Ex. A at Ex. A.

Each Limited Partner acknowledges and agrees that the General Partner may have interests, obligations or duties with respect to other Limited Partners, DoubleLine Group Members or officers, directors, partners, members, shareholders, employees or agents of a DoubleLine Group Member that conflict with the interests of such Limited Partner ("Conflicts of Interest"). With respect to such Conflicts of Interest, each Limited Partner confirms that it has no objection, and shall not object, to the General Partner managing such interests and performing such obligations or duties and hereby waives any such actual or potential Conflicts of Interest (including any duty to present any corporate opportunity that the General Partner presents to another DoubleLine Group Member to the Partnership) and any claims such Limited Partner may have arising out of any Conflict of Interest.[13]

Section 12.10 of the LPAs, titled "No Modification of Duties," reads as follows:

Except as otherwise expressly provided in Section 4.7, nothing in this Agreement is intended to or shall be interpreted to restrict, modify, waive or eliminate the duties of any Partner under the laws of the State of Delaware for decisions, actions or exercises of discretion made by such Partners.[14]

On January 1, 2013, Gundlach and Lariscy, through Gundlach's control of The General Partner, caused DLC to shift all of its employees, contracts, and operations to DLG.[15] They also caused DLC to enter into a services agreement with DLG under which DLC would pay DLG all of its expenses plus a service fee to be set in The General Partner's discretion.[16]

---

[13] JX 955 § 4.7; JX 956 § 4.7.

[14] JX 955 § 12.10; JX 956 § 12.10.

[15] Final Award at 23; Defs.' Opening Br. Tab 16 ¶¶ 28–36.

[16] Final Award at 23; JX 298 § 4(a)–(b).

4

In June 2013, Barach began to vaguely understand that DLG would harm the value of his entity, and Barach and Damiani began to investigate the new structure.[17] Gundlach was not happy when Barach and Damiani began to question the new corporate structure and launched a counter-investigation against them.[18] The General Partner's board of managers met several times between June 26 and July 15, 2013 to discuss "the reports of extreme misconduct" by Barach and Damiani and to consider the steps of the board's investigation.[19] On July 10, the board concluded that Barach should be removed as President of DLG and should be issued a written and verbal warning, and that Damiani should be removed from his positions at DLC and DLG and should be issued a verbal warning.[20]

On or around July 18, 2013, Barach signed a release acknowledging his understanding of the structure and releasing all claims against The General Partner, DLH, DLG, DL GP, and DLC regarding the new structure, the service contracts or cash flows between those entities, and any distributions from DLG or DLH (the "2013 Release").[21]

---

[17] Defs.' Opening Br. Tab 2 at 15.

[18] JX 2065; JX 2071.

[19] JX 2088.

[20] *Id.* at '944.

[21] JX 2069 §§ 1–2, 6.

## C. Dilution Claims

In 2014, Gundlach announced his plan to increase DLC's partnership units by 20% annually through new unit awards intended to reward and incentivize performance.[22]  Gundlach had sole discretion to determine the recipients and amounts of the awards, which he exercised based on "his subjective assessment of each recipient's individual contributions to [DLC] that year."[23]  Had these new units been distributed *pro rata* based on the limited partners' existing holdings, the partners' proportionate ownership interests in DLC would have been unchanged. But between 2015 and 2020, Gundlach awarded Barach, Damiani, and Susan Nichols Steinbach less than their *pro rata* shares of equity, resulting in an increase in the combined holdings of Gundlach and his wife from 30.40% to 38.72%.[24] Bonnie Baha, an employee and a limited partner of DLC, died in 2016.[25]  Her units passed to The Baha Community Property Trust (the "Baha Trust").[26]  Over the next two years, the Baha Trust's holdings were diluted by 0.94%.[27]  In 2018, the Baha Trust's holdings were repurchased by DLC, purportedly at market value.[28]

---

[22] Defs.' Opening Br. Tab 17 ¶¶ 49–50.

[23] Final Award at 58.

[24] JX 1166 at Ex. 3A.

[25] Final Award at 5–6.

[26] *Id.*

[27] JX 1166 at Ex. 3A.

[28] Final Award at 9.

In December 2018, Damiani sent an email to his personal counsel at Quinn, Emanuel, Urquhart & Sullivan, LLP seeking advice regarding Gundlach's dilution of his equity and inadvertently copied Lariscy.[29] Lariscy notified Gundlach about the email, who then sent Barach and Damiani a series of accusatory emails.[30] The next day, Gundlach terminated Damiani and placed Barach on administrative leave.[31]

Following meetings of The General Partners' board of managers on December 27, 2018, and January 3, 2019, Gundlach decided not to terminate Barach and rescinded his termination of Damiani.[32]

Barach retired from DLC in April 2020, and Steinbach retired effective May 1, 2020.[33] In August 2020, Gundlach terminated Damiani.[34] Following Barach, Steinbach, and Gundlach's departure, Gundlach continued to dilute their holdings in DLC and caused The General Partner to repurchase all of their Alternative Value Units for no additional value.

---

[29] Defs.' Opening Br. Tab 18 at 452:6–453:2 (Lariscy).

[30] *Id.*; *see* JX 824; JX 825; JX 826; JX 827.

[31] JX 847; JX 851.

[32] JX 1688; JX 882; Defs.' Opening Br. Tab 9 at 13; Defs.' Opening Br. Tab 17 ¶ 40.

[33] Defs.' Opening Br. Tab 7 at 12.

[34] *Id.*

**D.     The Arbitration Proceeding**

On December 31, 2019, the Baha Trust commenced JAMS arbitration proceeding No. 1220064308 (the "'308 Action") against Gundlach and The General Partner ("Respondents"), including DLC and DL GP as nominal respondents.[35]  The arbitral panel comprised former Chief Judge of the United States District Court for the District of New Jersey, Garrett E. Brown, former Chief Judge of the United States District Court for the District of Delaware, Gregory M. Sleet, and Richard Chernick, the Vice President and Managing Director of JAMS's Arbitration Practice (the "Panel").[36]  The Baha Trust alleged that the Respondents had improperly diluted the value of the Baha Trust's interests in DLC and DL GP by issuing additional units to other limited partners after Baha's passing, improperly reduced pro-rata distributions due to the Baha Trust by skimming profits from DLC via the services arrangement with DLG, and ultimately repurchased the Baha Trust's interests based on a flawed valuation.[37]  The Baha Trust asserted claims for breach of fiduciary duty, breach of contract, breach of the implied covenant of good faith and fair dealing, declaratory relief, accounting, and injunctive relief.[38]

---

[35] Final Award at 5–6.

[36] *Id.* at 67.

[37] *Id.* at 5–6.

[38] *Id.*

8

On December 4, 2020, Barach, Damiani, and Steinbach served a JAMS arbitration demand on Gundlach, DL GP, DLG, and DLH which lodged similar allegations and causes of action against the Respondents and sought to consolidate that proceeding with the '308 Action.[39]   The request for consolidation was unopposed, and on December 18, 2020, Barach, Damiani, and Steinbach's claims were consolidated into the '308 Action.[40]

Shortly after learning of the new arbitration demand against him, Gundlach sent a series of angry text messages to Barach, indicating that he believed that Barach's "recent actions justify significant clawbacks of past compensation."[41]  On January 14, 2021, the board of The General Partner resolved that Barach and Damiani had acted in a manner constituting "Cause" under the LPAs.[42]  Pursuant to those agreements, The General Partner then repurchased Barach and Damiani's remaining equity at "Alternative Value," which was the value of their unpaid distributions, on March 15, 2021.[43]  Barach was paid a total of $10,570,730 and Damiani was paid $4,310,382.[44]

---

[39] JX 1094.

[40] Final Award at 7.

[41] JX 1093.

[42] JX 1635 at 32–34.

[43] JX 1126; JX 1127; JX 1128; JX 1129.

[44] JX 1126; JX 1127; JX 1128; JX 1129.

On January 15, 2021, Respondents" filed their response to the consolidated demand, denying the factual allegations and asserting several affirmative defenses.[45] Respondents also asserted counterclaims against Barach and Damiani for declaratory relief, breach of contract, promissory estoppel, failure of consideration–rescission, fraud, and fraud–rescission.[46] The counterclaims allege that Barach and Damiani had entered into contracts promising not to challenge the service fees or structure again in 2013 and 2018 in exchange for not being terminated.[47] They sought a declaration that the board's determination of Cause was proper and an award of monetary relief in the form of disgorgement or damages to recoup the salary, benefits, partnership distribution, and equity provided to Barach and Damiani after the 2013 Release.[48]

On January 29, 2021, Respondents' counsel informed the Panel that several DLC-affiliated entities had filed a demand for arbitration with JAMS against certain trusts to which Barach had purportedly transferred or allocated equity (the "'049 Action"), asserting claims which arose out of the same nucleus of facts as the '308 Action.[49] Respondents requested for the '049 Action and '308 Action to be

---

[45] JX 2196.

[46] *Id.*

[47] *Id.*

[48] *Id.*

[49] Compl. Ex. A ("Final Award") at 9.

consolidated.[50]  On February 1, 2021, the Claimants moved to dismiss the claims in the '049 demand and argued that those claims were not arbitrable before the Panel because they were subject to different arbitration provisions located in separate employment agreements.[51]  On March 4, 2021, the Panel issued an order consolidating the actions but bifurcating the proceeding into two phases, the first addressing the dilution claims in the '308 Action and the second addressing the Respondents' counterclaims in the '308 Action and its affirmative claims against the trusts in the '049 Action.[52]

The Phase I hearing began on May 10, 2021 via Zoom.[53]  The Panel heard testimony from seven fact witnesses and six expert witnesses.[54]  After receiving post-hearing briefing, the Panel issued an interim award on September 9, 2021, resolving all issues presented in Phase I of the proceeding.[55]  The Phase II hearing commenced via Zoom on November 8, 2021, included the testimony of eight fact witnesses and four experts, and was continued on November 22, 2021, to hear one additional expert witness.[56]  After post-hearing briefing, the Panel issued its final

---

[50] *Id.*

[51] *Id.*

[52] *Id.* at 10.

[53] *Id.* at 12.

[54] *Id.* at 12–13.

[55] *Id.* at 13–14.

[56] *Id.* at 14–15.

award on April 13, 2022.[57]  On April 20, 2022, Respondents submitted a request to correct certain ministerial errors in the final award and on May 2, the Panel issued a corrected final award (the "Final Award").[58]

### E.    Procedural History

On May 10, 2022, the Plaintiffs filed a complaint to confirm the Final Award.[59]  On July 12, 2022, the Defendants filed an answer and asserted a counterclaim to vacate the award.[60]  On July 12, 2022, the Defendants moved for summary judgment on their counterclaim.[61]  The Plaintiffs filed an amended complaint on July 29, 2022, and on October 4, 2022, the Plaintiffs filed a cross-motion for summary judgment, seeking to confirm the Final Award.[62]  After briefing, the court heard argument on November 1, 2023.[63]

---

[57] *Id.* at 15.

[58] Compl. Ex. A.

[59] Dkt. 1.

[60] Dkt. 15.

[61] Dkt. 16.

[62] Dkts. 42, 43.

[63] Dkt. 21.  In addition, the parties stipulated to correct the Final Award as to the identification of the trustees of the Baha Trust.  Dkt. 57.

12

## II. ANALYSIS

"A motion for summary judgment is the 'common [method] for this court to determine whether to vacate or confirm an arbitration award.'" *TD Ameritrade, Inc. v. McLaughlin, Piven, Vogel Sec., Inc.*, 953 A.2d 726, 730 (Del. Ch. 2008) (quoting *Beebe Med. Ctr. Inc. v. InSight Health Servs. Corp.*, 751 A.2d 426, 431 (Del. Ch. 1999)). Under Court of Chancery Rule 56, summary judgment may be granted if "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Ct. Ch. R. 56(c). "Where, as here, the parties file cross motions for summary judgment and do not argue that there is any issue of material fact to the disposition of either motion, the court shall deem the motions to be the equivalent of a stipulation for a decision on the merits based on the record submitted with the motions." *Polychain Cap. LP v. Pantera Venture Fund II LP*, 2022 WL 2467778, at *6 (Del. Ch. July 6, 2022).

The Final Award is governed by the terms of the Federal Arbitration Act ("FAA").[64] An application to confirm an arbitration award and a competing application to vacate an arbitration award are "simply opposites sides of the same

---

[64] JX 955 § 12.1(a) ("Any and all disputes, claims or controversies arising out of or relating to [the DLC LPA] . . . shall be submitted to final and binding arbitration pursuant to the Federal Arbitration Act, 9 U.S.C. Section I *et seq.*"); JX 956 § 12.1(a) (same as to the DL GP LPA). State arbitration laws displace the Federal Arbitration Act only when the parties "clearly evidence their intent to be bound by such rules." *Pers. Decisions, Inc. v. Bus. Planning Sys., Inc.*, 2008 WL 1932404, at *6 (Del. Ch. May 5, 2008).

FAA coin." *PG Publ'g, Inc. v. Newspaper Guild of Pittsburgh*, 19 F.4th 308, 313 (3d Cir. 2021). "A court must confirm an arbitration award unless it is vacated, modified, or corrected as prescribed in Sections 10 and 11" of the FAA. *Hall St. Assocs., L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 582 (2008) (cleaned up). Thus, the court approaches its analysis by focusing on Defendants' arguments in favor of vacatur.

"'[R]eview of an arbitration award is one of the narrowest standards of judicial review in all of American jurisprudence.'" *SPX Corp. v. Garda USA, Inc.*, 94 A.3d 745, 750 (Del. 2014) (quoting *TD Ameritrade,* 953 A.2d at 732). The court's review is limited to the four specific grounds upon which an award may be vacated under Section 9 of the FAA:

> (1) where the award was procured by corruption, fraud, or undue means;
> (2) where there was evident partiality or corruption in the arbitrators, or either of them;
> (3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or
> (4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10(a). If the motion to vacate is denied, the motion to confirm must be granted. *Polychain*, 2022 WL 2467778, at *4; 9 U.S.C. § 9 ("[T]he court must grant

14

[a motion to confirm the award] unless the award is vacated, modified, or corrected").

Defendants argue that vacatur is appropriate because the Panel: (1) manifestly disregarded the law in interpreting Section 4.7 of the LPAs as a partial waiver of Gundlach's fiduciary duties, (2) manifestly disregarded the law and public policy by "affirming the general partner's retaliatory 'cause' determination," and (3) deprived the Defendants of the opportunity to present certain evidence relevant to the valuation of the limited partnership units and ignored the "undisputed fact" that the Baha Trust was underpaid by $865,000.

## A.    Interpretation of Section 4.7

Defendants argue that the Final Award must be vacated because the Panel exceeded its powers by incorrectly interpreting Section 4.7 of the LPAs as waiving the fiduciary duty of loyalty. "[A]n arbitrator exceeds his powers when he acts in manifest disregard of the law." *Auto Equity Loans of Del., LLC v. Baird*, 232 A.3d 1293, at *3 (Del. 2020) (ORDER).

> [T]he test for "manifest disregard for the law" is not whether the arbitrator misconstrued the contract-even if the contract language is clear and unambiguous. To vacate an arbitration award based on "manifest disregard of the law," a court must find that the arbitrator consciously chose to ignore a legal principle, or contract term, that is so clear that it is not subject to reasonable debate.

*SPX*, 94 A.3d at 747. "'[A]s long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a court is

15

convinced that he committed serious error does not suffice to overturn his decision.'"

*Id.* at 751 (citing *United Paperworkers Int'l Union, AFL–CIO v. Misco, Inc.*, 484 U.S. 29, 38 (1987)).

The question for the court is "whether the arbitrator's decision 'rationally can be derived from either the [LPAs] or the parties' submissions to the arbitrator.'" *SPX*, 94 A.3d at 751 (quoting *TD Ameritrade*, 953 A.2d at 732). "Because the parties 'bargained for the arbitrator's construction of their agreement,' an arbitral decision 'even arguably construing or applying the contract' must stand, regardless of a court's view of its (de)merits." *Oxford Health Plans LLC v. Sutter*, 569 U.S. 564, 569 (2013) (quoting *E. Associated Coal Corp. v. Mine Workers*, 531 U.S. 57, 62 (2000)). Thus, "Delaware courts will vacate an award due to an arbitrator exceeding his authority only 'where the arbitrator acts in manifest disregard of the law . . . meaning the arbitrator (1) knew of the relevant legal principle, (2) appreciated that this principle controlled the outcome of the disputed issue, and (3) nonetheless willfully flouted the governing law by refusing to apply it.'" *Polychain*, 2022 WL 2467778, at *4 (quoting *SPX*, 94 A.3d at 751).

Defendants contend that the Panel willfully flouted Delaware law, which requires that any waiver of fiduciary duties be "clear and unambiguous." Defs.' Opening Br. 31. But the Panel expressly recognized the "clear and unambiguous" standard and applied it. *See* Final Award at 17 ("[T]he Panel is persuaded that

16

although the term 'fiduciary duty' does not appear in Section 4.7, the 'clear and unambiguous language of [Section 4.7]' nevertheless 'displaces traditional fiduciary duty principles' with respect to the duty of loyalty." (quoting *Brickell P'rs v. Wise*, 794 A.2d 1, 4 (Del. Ch. 2001)). In reviewing an arbitration award, the court does not sit as an appellate court to review the Panel's interpretation of the contract. *United Steelworkers of Am. v. Enter. Wheel & Car Corp.*, 363 U.S. 593, 599 (1960) ("It is the arbitrator's construction which was bargained for; and so far as the arbitrator's decision concerns construction of the contract, the courts have no business overruling him because their interpretation of the contract is different from his."). Where, as here, the Panel considered and applied the law cited to it based on its interpretation of a contract, there is no basis for vacatur.

Defendants next argue that the Panel erred when it read Section 4.7 as waiving fiduciary duties when Section 4.7 did not use the words "fiduciary duty." Defendants cite *Ross Holding & Management Co. v. Advance Realty Group, LLC*, 2014 WL 4374261 (Del. Ch. Sept. 4, 2014), and *Manti Holdings, LLC v. Carlyle Group Inc.*, 2022 WL 444272 (Del. Ch. Feb. 14, 2022), for the principle that fiduciary duties cannot be waived by a provision which fails to use the words "fiduciary duty." Yet the Defendants did not raise either case in their briefing to the Panel. *See World-Win Mktg., Inc. v. Ganley Mgmt. Co.*, 2009 WL 2534874, at *3 (Del. Ch. Aug. 18, 2009) ("[A party's] failure to make arguments to the arbitrator is

17

not grounds for vacating the arbitrator's decision."); *DiRussa v. Dean Witter Reynolds Inc.*, 121 F.3d 818, 823 (2d Cir. 1997) (declining to find that the arbitrators consciously disregarded law which was not raised by the parties). In order to have manifestly disregarded Delaware law, the Panel must have known of this principle, appreciated that the principle controlled the outcome, and yet refused to apply it. *See Polychain*, 2022 WL 2467778, at *4. The Defendants cannot now argue that the Panel affirmatively knew of and appreciated a "basic principle of Delaware law" which the Defendants themselves omitted entirely from their argument.

### B. Panel's Finding of Good Faith

Defendants argue that the Panel manifestly disregarded the law when it concluded that the board acted in subjective good faith in determining that Barach and Damiani had engaged in conduct constituting "Cause" as defined in the DLC LPA. The Panel concluded that the board reached its conclusion in subjective good faith based on Barach and Damiani's representations regarding their understanding of and agreement not to challenge the DLC and DLG structure and Barach's repeated votes to confirm that structure as a former member of the board.[65]

DLC's Fifth Amended LLC Agreement provides that:

If at any time the General Partner determines that a DoubleLine Partner (i) has failed to act in good faith with respect to the DoubleLine Business, (ii) has taken any action or inaction that would constitute a breach of this Agreement, (iii) has acted in any manner that has harmed the reputation or

---

[65] Final Award at 51.

brand of the DoubleLine Business, or (iv) has acted in any other manner that constitutes Cause, the Units then held by such DoubleLine Partner shall automatically become Alternative Value Units and the General Partner shall have the right pursuant to, and in accordance with Section 4.3A of this Agreement, to repurchase such DoubleLine Partner's Units at Alternative Value.[66]

Cause is "determined in the sole discretion of the General Partner exercised in good faith with respect to any DoubleLine Partner," including "the engagement in any unethical or disloyal conduct, including, without limitation, fraud, embezzlement, theft defamation or dishonesty."[67] After reviewing applicable law and the record, "the Panel [was] persuaded that upon the filing of the Amended Demand in the '308 Action, the Board had at least a subjective good faith basis to determine that Mr. Barach and Mr. Damiani's representations to the Board in 2013 rose to the level of 'dishonesty' or 'misrepresentations', or both."[68]

As Defendants acknowledge, the Panel was not asked to make an independent finding as to the truth or falsity of Barach and Damiani's statements in 2013 or 2018.[69] Instead, the Panel evaluated whether the board made its determination in subjective good faith.[70] The Panel stated its selection of the standard resulted from a "straightforward application of the plain language of the Fifth Amended

---

[66] JX 955 § 4.1(b).

[67] *Id.* at 3–4.

[68] Final Award at 51.

[69] Defs.' Vacatur Reply Br. 17.

[70] Final Award at 42.

Agreement to well-established Delaware law."[71]  An application of the subjective

good faith standard requires an inquiry into the board's state of mind.  *See Allen v.*

*El Paso Pipeline GP Co., L.L.C.*, 113 A.3d 167, 179 (Del. Ch. 2014).  The Panel

made that inquiry and reached a conclusion:  "[U]pon the filing of the Amended

Demand in the '308 Action, the Board had at least a subjective good faith basis to

determine that Mr. Barach and Mr. Damiani's representations to the Board in 2013

rose to the level of 'dishonesty' or 'misrepresentations', or both."[72]  The Defendants

have not established that the Pane exceeded its powers in deciding this issue.[73]

### C.    Public Policy

As an alternative basis for vacatur, Defendants contend that the award violates

public policy by imposing liability on Barach and Damiani based on their

commencement of arbitration.  Arbitration awards will be vacated if they violate a

"well defined and dominant" public policy.  *W.R. Grace & Co. v. Local Union 759*,

461 U.S. 757, 766 (1983).

---

[71] *Id.*

[72] *Id.* at 51.

[73] Defendants argue that an arbitral award may manifestly disregard the law when it "is legally irreconcilable with the undisputed facts."  Defs.' Opening Br. 43 (citing *Coutee v. Barington Cap. Gp., L.P.*, 336 F.3d 1128, 1133 (9th Cir. 2003) and *Am. Postal Workers Union AFL-CIO v. U.S. Postal Serv.*, 682 F.2d 1280, 1284 (9th Cir. 1982), *cert. denied*, 459 U.S. 1200 (1983)).  Yet they do not, and cannot, argue that the board's subjective good faith was undisputed.  Final Award at 50–51.

Defendants argue that the Final Award violates the litigation privilege, a doctrine that protects statements "made prior to, or during judicial proceedings, so long as the statements were made in an effort to address the alleged grievance between the parties." *BRP Hold Ox, LLC v. Chilian*, 2018 WL 5734648, at *4–5 (Del. Super. Oct. 31, 2018). The doctrine applies primarily to defeat claims for defamation, but has been extended to provide a defense for contractual claims based on non-disparagement clauses. *Sheehan v. AssuredPartners, Inc.*, 2020 WL 2838575, at *16–17 (Del. Ch. May 29, 2020); *Ritchie CT Opps, LLC v. Huizenga Managers Fund, LLC*, 2019 WL 2319284, at *14 (Del. Ch. May 30, 2019).

As the Panel noted, the Defendants "cited no case applying controlling Delaware law that persuasively supports effectuation of the 'litigation privilege' where, as here, [Plaintiffs] seek to enforce an express contractual right that unquestionably exists between the Parties."[74] The Panel considered the Defendants' arguments and declined to extend the doctrine beyond the Panel's understanding of its limitations under the case law. In doing so, the Panel embraced the careful "policy balance" that Delaware has crafted around the litigation privilege. *See Paige Cap. Mgmt., LLC v. Lerner Master Fund, LLC*, 22 A.3d 710, 720 (Del. Ch. 2011) ("[T]he policy rationale for the privilege is best served by limiting the privilege's

---

[74] Final Award at 53. The cases that Defendants cite at this stage extend the litigation privilege only to contractual non-disparagement agreements. Defs.' Opening Br. 47–48 (citing *Ritchie*, 2019 WL 2319284, and *Sheehan*, 2020 WL 2838575).

scope to only defamation and related torts arising from derogatory statements alleged to be harmful to the suing party's reputation or psychic well-being."). The Final Award does not violate a "well-defined and dominant" public policy.

### D.    Evidentiary Determinations

Defendants argue that the Final Award should be vacated because the Panel refused to compel the Plaintiffs to produce evidence pertinent to the dispute. Under the FAA, a court may vacate an award "where the arbitrators were guilty of misconduct . . . in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced." 9 U.S.C. § 10(a)(3). "[T]he mere refusal to hear evidence does not automatically require the vacatur of an award: it is well settled that arbitrators are afforded broad discretion to determine whether to hear evidence." *TD Ameritrade*, 953 A.2d at 733 (quotations omitted) (cleaned up).

In the arbitration, the Baha Trust sought to compel the production of the valuations used to determine the price at which to cash out its units, as well as "'any communication or document' relating to those valuations."[75] The Panel denied the Baha Trust's motion to compel these documents. The Panel noted that the Plaintiffs had produced all valuations in their custody or control, and that the Baha Trust had not persuaded the Panel that it had "any reasonable need for additional documents

[75] Defs.' Opening Br. Tab 15 at 6.

22

given the scope of valuation-related information already in [the Baha Trust's] possession."[76] Defendants complain that the Panel's denial of the motion to compel prevented them from developing evidence to show that the valuations were tainted. Yet in its motion to compel, the Baha Trust did not assert that it needed communications related to valuation in order to prove that the valuations were tainted.[77]

Defendants essentially argue that their inability to persuade the Panel that the valuations were tainted resulted from the Panel's denial of the Baha Trust's motion to compel discovery into these valuation materials. That argument does not justify vacating the Final Award. First, Defendants do not point to specific evidence that they would have uncovered which would show the valuations were tainted. Second, and more important, the Defendants overlook the basis for the Panel's decision. The award provides:

> For the avoidance of doubt, assuming *arguendo* that Claimants' myriad arguments could be construed as asserting that the HDA and SRR Valuations were "tainted" based upon the facts that gave rise to their Looting claim – *i.e.*, that Respondents had provided improper inputs to the Independent Evaluators on that basis – the Panel rejects that assertion. For the reasons explained above, Claimants' Looting claim (whether viewed as a breach of fiduciary duty or contract claim) is clearly time-barred by both the statute of limitations and the equitable doctrine of laches. Because it is, the Panel shall not effectively revive

---

[76] *Id.* at 7.

[77] Defs.' Opening Br. Tab 13.

that claim by considering it within in the separate context of Claimants' Valuation claim.[78]

As the Panel explained, the discovery sought in the motion to compel was not material to the Panel's decision to deny Defendants' valuation claims. The claims as to the "tainted" valuations were barred on other grounds. Even if such evidence were material, it was available from another source, DLC's CFO and main point of contact with valuation firms, Henry Chase, who Defendants cross-examined during the arbitral proceeding.[79] Accordingly, the refusal to order production of valuation-related communications is not a basis for vacatur.[80]

Finally, Defendants contend that the award must be vacated because the Panel ignored the "undisputed" fact that the Baha Trust was shorted $865,000 in unpaid distributions when its interests were repurchased. But this fact was disputed. The Plaintiffs argued that unpaid distributions were included as a subset of market value.[81] In the Final Award, the Panel noted that "in connection with the repurchase of the Baha Trust's shares . . . of DL Capital in 2018, Respondents followed the . . . provisions of the Fifth Amended Agreement," and deferred to the valuations created

---

[78] Final Award at 30 n.8.

[79] Final Award at 12, 14. Chase testified on three separate occasions during the proceedings. *Id.*

[80] Pls.' Vacatur Answering Br. Ex. 15.

[81] Defs.' Opening Br. Tab 4 at 56.

pursuant to the contract.[82]  The Panel, thus, did consider Defendants' arguments as to the underpayment of Baha Trust.  Accordingly, Defendants' argument for vacatur fails.

* * *

Neither party contends that there is a material issue of fact on this record. Entry of summary judgment is appropriate.  Having found no reason to vacate the award, the final award must be confirmed.  9 U.S.C. § 9.

## E.    Attorneys' Fees

Having prevailed in confirming the arbitration award, Plaintiffs seek their attorneys' fees and costs in bringing this action.  Under the American Rule, each side is required to bear their own fees.  *Johnston v. Arbitrium (Cayman Islands) Handels AG*, 720 A.2d 542, 545 (Del. 1998).  There are recognized exceptions to the general rule.  "An exception to [the American Rule] is found in contract litigation that involves a fee shifting provision.  In these cases, a trial judge may award the prevailing party all of the costs it incurred during litigation."  *Mahani v. EDIX Media Gp., Inc.*, 935 A.2d 242, 245 (Del. 2007).  In addition, courts may shift fees if one party acts in bad faith in relation to the litigation.  *Johnston*, 720 A.2d at 545.

The arbitration provision in the LPAs provides:  "The provisions of this Section 12.12 may be enforced by any court of competent jurisdiction, and, to the

---

[82] Final Award at 28–30.

extent permitted by law, the party seeking enforcement shall be entitled to an award of all costs, fees and expenses, including attorneys' fees, to be paid by the party against whom enforcement is ordered."[83]  This provision applies to shift fees for suits brought when one party refuses to submit to arbitration.  A suit to confirm an award is not an action to enforce an arbitration provision, as the obligations imposed by the arbitration clause have already been performed.  Notably, the arbitration clause does not speak to proceedings to confirm or vacate an award.  Because Section 12.12(b) of the LPAs does not apply to suits to confirm a final award, it does not supply a contractual basis for fee shifting.

Plaintiffs also seek their fees under the bad faith exception to the American Rule on the theory that Defendants' arguments for vacatur were "particularly meritless."[84]  "There is no single standard of bad faith that justifies an award of attorneys' fees—whether a party's conduct warrants fee shifting under the bad faith exception is a fact-intensive inquiry." *Auriga Cap. Corp. v. Gatz Props., LLC*, 40 A.3d 839, 880–81 (Del. Ch. 2012).  "[T]he bad faith exception is not lightly invoked." *Id.* at *1.  "[A]ttorneys' fees may be awarded if it is shown that the

---

[83] JX 955 § 12.12(b).

[84] Pls.' Vacatur Answering Br. 55.  Whether the Plaintiffs are entitled to their fees under the bad faith exception to the American Rule is a question of state law. *Whiteside v. New Castle Mut. Ins. Co.*, 595 F. Supp. 1096, 1100 (D. Del. 1984) ("Under *Erie* principles, attorney's fees are considered substantive and controlled by state law in diversity cases. . . . Under Delaware conflicts rules, attorney's fees are considered 'procedural' (in the conflicts sense), and Delaware courts apply Delaware attorney's fees provisions.").

defendant's conduct forced the plaintiff to file suit to secure a clearly defined and established right." *McGowan v. Empress Ent. Inc.*, 791 A.2d 1, 4 (Del. Ch. 2000). Fee shifting under the bad faith exception is appropriate only upon a finding by "clear evidence" that the party against whom the fee award is sought acted in subjective bad faith. *Johnston*, 720 A.2d at 546. This remedy is reserved only for extraordinary cases. *Lawson v. State*, 91 A.3d 544, 553 (Del. 2014).

This is not one of those extraordinary cases. Although Defendants' challenges to the arbitration award were not ultimately successful, the court is not persuaded that the Defendants proceeded in subjective bad faith. Accordingly, Plaintiffs' request for fee shifting must be denied.

## III. CONCLUSION

Defendants' arguments against the award are not strong enough to propel Defendants to the high summit of vacatur. Plaintiffs' motion to confirm the award is granted. Plaintiffs' application for attorneys' fees is denied. Defendants' motion to vacate the award is denied. The award is confirmed.

27